Jermaine WRIGHT, Defendant
Below–Appellant,

v.

STATE of Delaware, Plaintiff
Below–Appellee.

No. 423, 2013.

Supreme Court of Delaware.

Submitted: Feb. 19, 2014.
Decided: May 19, 2014.

Herbert W. Mondros, Esquire, Margolis Edelstein, Wilmington, Delaware, and Claudia Van Wyk, Esquire (argued), Billy Nolas, Esquire, James Moreno, Esquire, and Tracy Ulstad, Esquire, Federal Community Defender Office for the Eastern District of Pennsylvania, Philadelphia, Pennsylvania, for Appellant.

Maria T. Knoll, Esquire (argued) and Gregory E. Smith, Esquire, State of Delaware Department of Justice, Wilmington, Delaware, for Appellee.

Before STRINE,* Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

Defendant–Below/Appellant Jermaine Wright appeals from a Superior Court order denying his fourth motion for postconviction relief and reimposing Wright's conviction and sentence. In 1992, a jury convicted Wright of Murder in the First Degree, Robbery in the First Degree, and related weapons charges in connection with the robbery of the Hi–Way Inn liquor store and murder of the liquor store clerk, Phillip Seifert. Wright was then sentenced to death.

At his 1992 trial, the State did not present any forensic evidence including fingerprints, shoe prints, or fibers placing Wright at the scene. Nor did the State present the murder weapon, shell casings, the getaway car, or eyewitnesses to identify Wright. Instead, a jury convicted Wright on his confession to the police while under the influence of heroin and the testimony (since recanted) of a prison informant who testified that Wright admitted the crime.

In 2012, the Superior Court vacated Wright's conviction and sentence because it had "no confidence in the outcome of the trial." The Superior Court found that the State suppressed exculpatory evidence of a

* Originally sitting by designation pursuant to art. IV, § 12·of the Delaware Constitution and Supreme Court Rules 2 and 4(a) at the time of oral arguments to fill up the quorum as required.

similar attempted robbery at a nearby liquor store in violation of *Brady v. Maryland*.[2] A *Brady* violation occurs where the State fails to disclose material evidence that is favorable to the accused, because it is either exculpatory or impeaching, causing prejudice to the defendant.

The attempted robbery took place at the Brandywine Village Liquor Store less than an hour prior to the Hi–Way Inn robbery by suspects matching the same description and using a similar weapon. The Superior Court also found that Wright did not knowingly and intelligently waive his *Miranda* rights because police obtained his confession through defective warnings. The remaining claims were denied. The State appealed Wright's *Brady* and *Miranda* claims. A majority of this Court reversed, ordering Wright's conviction and sentence reimposed, because the *Miranda* issue was procedurally barred and that, given his confession, the evidence about the Brandywine attempted robbery would not have led to a different result.

After a reinstatement of his conviction and sentence, Wright now appeals the remaining claims originally denied by the Superior Court. He argues that the State suppressed additional material *Brady* evidence prior to his trial. This evidence includes impeachment evidence related to Gerald Samuels, the prison informant who testified that Wright confessed to the murder, and exculpatory and impeachment evidence related to Kevin Jamison, a witness Wright contended committed the murder.

Wright is not entitled to a perfect trial, but he is entitled to a fair one where material exculpatory and impeachment evidence is disclosed and not suppressed.

"[W]hen the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment."[3] This is exactly what happened here. The cumulative effect of the multiple *Brady* violations in this case creates a reasonable probability that the verdict would have been different if the exculpatory and impeachment evidence had been disclosed. Accordingly, we must reverse Wright's conviction and death sentence and remand for a new trial.

## I. Facts [4]

On the evening of January 14, 1991, Phillip Seifert was murdered at the Hi–Way Inn, a tavern and liquor store located on Governor Printz Boulevard near Wilmington. Debra Milner was working at the bar of the Hi–Way Inn while Seifert was working in the adjacent liquor store. At about 9:20 p.m., Milner saw a black man in his mid-twenties with a round face wearing a red plaid flannel shirt enter the bar, look around, and leave without making a purchase.

At about 10:20 p.m., the liquor store doorbell rang indicating that someone had entered. Seifert went to wait on the customer, and Milner answered the telephone. While she was on the phone, Milner heard the bell ring two more times, followed by a noise that she thought sounded like a firecracker. When Milner walked toward the passageway to the liquor store, she saw Seifert slumped across the counter. She heard a gunshot and saw blood around Seifert. Milner then ran and hid.

Around 10:30 p.m., George Hummell, a customer who stopped at the Hi–Way Inn

---

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. *Cone v. Bell*, 556 U.S. 449, 469, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).

4. The facts and procedural history are derived from Superior Court's 2012 Supplemental Opinion. *State v. Wright*, 2012 WL 1400932 (Del.Super.Ct. Jan. 3, 2012).

on his way to work, saw two men leave the liquor store as he was waiting to turn into the parking lot. Hummell observed one of the men, the shorter of the two, return to the store while the other ran across the parking lot. After a short interval, the man who had reentered the liquor store came back outside, ran across the road, and entered a black Volkswagen Rabbit parked in a parking lot across the street from the Hi–Way Inn. The other man ran toward Wilmington on Governor Printz Boulevard and disappeared. According to Hummell, the man who returned to the store and then left by car was black and about five feet eight inches tall. The other man was also black and roughly six feet tall.

Upon entering the Hi–Way Inn, Hummell discovered Seifert sitting on a stool slumped over on the counter in a pool of blood. Hummell ran to a pay phone in the tavern and called 9–1–1. While he was on the phone with the 9–1–1 operator, Milner ran out from the back. Hummell then heard Seifert fall off the stool onto the floor.

Sergeant Gary Kresge of the Delaware State Police was the first officer to arrive at the scene. Inside, Sergeant Kresge saw the cash register in disarray and Seifert lying on his back, bleeding profusely. Paramedics arrived shortly thereafter to render assistance to Seifert, who was still alive. Seifert later died at the hospital. An autopsy revealed that Seifert had been shot three times with a .22 caliber weapon.

The scene investigation found no shell casings or useable prints belonging to the perpetrators. Without any leads, a State Police detective, the Chief Investigative Officer of the Seifert murder, passed out twenty-dollar bills at the Kirkwood Community Center in search of informants. Later, an unknown author passed a handwritten note to a Hi–Way Inn clerk indicating that "Marlo" was somehow involved in the killing.

Based on this anonymous tip, police started to consider Wright, whose middle name and alias is "Marlow," as a possible suspect. Police obtained an arrest warrant for Wright and a search warrant for his home based on two separate incidents unrelated to the Hi–Way Inn murder in which children in the Riverside area were injured by gunfire. The search warrant did not uncover any physical evidence linked to the Hi–Way Inn murder.

Two weeks after the murder, police arrested Wright based on the Riverside warrant just after 6 a.m. Wilmington Police Detectives started the interrogation of Wright by asking questions related to the Riverside shootings. According to one detective, Wright eventually brought up the Hi–Way Inn murder. Initially, Wright told the detectives that the murder involved someone name "Tee," who was later identified as Lorinzo Dixon, and another unnamed person. Later, Wright admitted in an unrecorded interview that he was the second, unnamed person and that he was the triggerman. Throughout this interview, Wright appeared erratic, due in part to his usage of heroin during the interrogation that officers failed to discover during the initial processing.

Roughly thirteen hours after his arrest, the Chief Investigative Officer of the Seifert murder, who had been listening to the interrogation, decided to record Wright's statements. On videotape, Wright told the detectives that Dixon had scouted the Hi–Way Inn, determining that it would be an easy target. Wright stated that when the two returned, Dixon ordered Wright to shoot the clerk or else Dixon would kill Wright. But many of the facts recited by Wright did not line up with the evidence. For example, Wright explained that the murder weapon was the .38 caliber hand-

gun that police found at his home even though Seifert was killed by a .22 caliber weapon. The video confession lasted about forty minutes.

Based on this information, police obtained and executed a search warrant for Lorinzo Dixon's apartment. Again police failed to uncover any evidence linking either Dixon or Wright to the crime. State Police also showed a photograph of Dixon to Milner to determine if Dixon was the man in the plaid shirt that came into the tavern before the shooting. Milner did not recognize the photo of Dixon or a photo of Wright. Nor did Hummell identify Dixon or Wright as one of the men he saw leaving the Hi–Way Inn.

## II. Procedural History

At Wright's trial, Milner, Hummell, and Sergeant Kresge, the first officer on the scene, testified for the State. The Chief Investigative Officer of the Seifert murder and the two Wilmington Detectives also testified regarding the investigation and Wright's interrogation. Wright's video-taped confession was introduced through the Chief Investigative Officer. The Deputy Chief Medical Examiner testified that Seifert died as a result of gunshot wounds. Seifert had been shot three times, once in the neck and twice in the head.

The defense presented an alibi for Wright. Four of Wright's friends testified that they had spent the evening with Wright at a pool house, Georgie Boy's, from approximately 7:30 p.m. until midnight; they then went to a friend's house where they stayed until 2:30 a.m. or 3:00 a.m. The defense also presented an alibi for Dixon. Catherine Green testified that she was on a date with Dixon that evening from about 7:00 p.m. until 2:00 a.m. or 3:00 a.m. Friends testified that they saw Green and Dixon at the movies. Witnesses also testified that they saw a man matching Hummell's description of the perpetrators acting suspiciously near the Hi–Way Inn around the time of the offense, and that the person was neither Wright nor Dixon.

Wright also called Antonio Jones, who testified that his friend, Kevin Jamison, and Jamison's cousin, Norman Curtis, had confessed to murdering Seifert. According to Jones, he and Jamison were at Jamison's house where Jones discovered a black, .22 caliber revolver with a longnose barrel. When Jones asked Jamison about the gun, Jamison recounted robbing a liquor store with Curtis.

> [Jamison] told us that they went into the liquor store, and something about they asked to cash a check or something to the man when they got in there. He said, he told the man to get the money up and the man reached down, and he didn't know if he was pushing an alarm or getting a gun or something like that.
>
> And Kevin said, at the time he shot the man. And the man was saying, "Don't kill me; don't kill me." He shot him twice in the head. And Norman grabbed the money and they ran out the store, and they left.[5]

Wright then called Jamison as a defense witness to show that Jamison and Curtis had actually committed the Hi–Way Inn murder. Jamison admitted that he was friends with Jones, but denied any involvement in the murder or talking with Jones about a murder or ever having a gun. When Wright's counsel questioned Jamison on the stand about his relationship to Curtis, Jamison stated that he and Curtis were cousins but the two were together "[e]very now and then," but "[n]ot often." [6]

Wright also called Robert Breglio, a former New York City police officer and bal-

---

5. Wright's 2012 Answering Br. Appendix at B 1863–64.

6. Id. at B 1779.

listics expert. Breglio testified that Phillip Seifert was most likely shot by a .22 caliber weapon based on the Medical Examiner's report of the entrance and exit wounds.

Finally, Wright took the stand. He testified that he was not involved in the Hi–Way Inn crime and that he was with his friends at the pool house that evening. He also testified that he was high on heroin at the time of his arrest and had barely slept in two days. He further explained that during the interrogation he continued to use heroin that was hidden in his pants and not discovered during the search incident to his arrest.

On rebuttal, and without prior notice to Wright, the State introduced the testimony of Gerald Samuels, one of Wright's fellow prisoners. Samuels testified that Wright admitted to him in prison that he shot Seifert. Wright again took the stand and denied Samuels' version, explaining that he had said he would shoot Samuels if he continued asking questions, not that he had shot Seifert.

Wright was convicted in the Superior Court of Murder in the First Degree and related charges and sentenced to death in 1992. His conviction and sentence of death were affirmed by this Court.[7] Wright's sentence of death was subsequently vacated as a result of a successful Rule 61 challenge.[8] In January 1995, after a resentencing hearing, Wright was again sentenced to death. This Court subsequently affirmed.[9]

### The 1997 Postconviction Proceeding & Federal Habeas Petition

In 1997, Wright filed his second motion for postconviction relief alleging ineffective assistance of counsel. After an expansion of the record, another evidentiary hearing, and full briefing, the Superior Court denied the motion, and this Court affirmed. In 2000, Wright filed a petition for writ of habeas corpus in the United States District Court for the District of Delaware. In 2003, while his habeas corpus petition was pending in the District Court, Wright filed a third motion for postconviction relief, which the Superior Court stayed pending the outcome of the federal case. In the District Court, the case went through several evidentiary hearings and several rounds of briefing.

### The 2009 Postconviction Proceeding

Wright filed his fourth Rule 61 petition with the Superior Court in December 2008 and amended the petition in 2009. Wright also asked the District Court, which had not yet ruled on his petition for habeas corpus, to stay the federal proceedings so that he could exhaust his state law remedies. The District Court granted that request. At his most recent Rule 61 hearing, Wright presented expert testimony relating to his addiction to heroin, the effects of that addiction during his interrogation, his intellectual status, and his susceptibility to suggestion. The State did not offer contradicting expert testimony.

Wright also presented exculpatory evidence that he alleged was suppressed by the State prior to his trial. This included evidence of a similar attempted robbery at the nearby Brandywine Village Liquor Store ("BVLS") that occurred thirty to forty minutes before the Hi–Way Inn robbery and murder. The BVLS was located

**7.** *Wright v. State,* 633 A.2d 329 (Del.1993).

**8.** *State v. Wright,* 653 A.2d 288 (Del.Super.Ct.1994).

**9.** *Wright v. State,* 671 A.2d 1353 (Del.1996).

one and a half miles away from the Hi-Way Inn. The BVLS incident involved two black males who unsuccessfully attempted to rob the liquor store by holding up the clerk, Edward Baxter, with a long-barreled handgun. Baxter wrestled the gun out of his face and chased the two men out of the store. Baxter reported the crime to Wilmington Police, who later obtained video surveillance of the suspects. The report collected by Wilmington Police, who forwarded the information to State Police, included descriptions of the suspects matching the descriptions provided by Milner and Hummell of the suspects in the Seifert murder. Neither Wright nor Dixon matched the description of the BVLS suspects based on video evidence, and Baxter failed to positively identify either Wright or Dixon. State Police considered the connection between the Hi-Way Inn murder and the BVLS attempted robbery but ruled out any connection between the two crimes.

Although there were news articles discussing the relationship between the BVLS attempted robbery and the Hi-Way Inn murder,[10] the record shows, and the Superior Court found, that Wright's counsel was unaware of any facts or relation to the BVLS attempted robbery. Nonpublic information surrounding the BVLS attempted robbery was not disclosed to him. Nor was the prosecutor aware of the BVLS attempted robbery connection because the police did not disclose the information to him.

In addition to the BVLS evidence, Wright introduced exculpatory and impeachment evidence related to Samuels and Jamison at the postconviction relief hearing. This evidence included a prior plea agreement between Samuels and the

Attorney General's Office showing his cooperation with the prosecution in another case. Samuels had agreed to testify against a co-defendant in another case in exchange for reduced charges and a favorable sentencing recommendation. Wright also introduced an affidavit of Samuels recanting his testimony against Wright. The affidavit stated that Samuels only testified against Wright because he expected to obtain leniency on his own charges. Wright also provided evidence to show that the State withheld impeachment evidence against Jamison. The impeachment evidence consisted of criminal records indicating that Jamison was close to Curtis.

Like the BVLS evidence, Wright's counsel was unaware of the Samuels and Jamison evidence at the time of the trial. There is also no indication that the trial prosecutor was aware of Samuels' prior plea agreement or Jamison's prior indictment and arrest. Rather, Wright alleges that the government as a whole withheld the exculpatory evidence at the time of his trial.

Finally, Wright introduced expert testimony about his addiction to heroin, the effects of that addiction as manifested during his interrogation, his intellectual status, and his susceptibility to suggestion. The uncontroverted experts collectively testified that Wright's recorded confession reflected a man who was sleep deprived, intoxicated, and predisposed to persuasion and who did not understand his rights. This indicated to the experts that Wright's statements were inaccurate, as shown by the numerous inconsistencies in the evidence and the statements Wright provided, including being wrong about the weap-

---

10. Phil Milford & Ann Stewart, *Clerk Shot In Store Holdup Dies*, Del. News Journal, Jan. 16, 1991, at E1; Ann Stewart, *City Man Charged in Clerk's Slaying*, Del. News Journal, Feb. 1, 1991, at B1.

on, the number of shots, and the manner of escape.

On January 3, 2012, the Superior Court issued a 102–page decision vacating Wright's convictions and his sentences, including the sentence of death. Based upon the totality of the evidence presented to it during the Rule 61 proceedings, the Superior Court concluded that it had "no confidence in the outcome of the trial." [11] The court granted Wright's postconviction relief on the grounds that his confession was given in violation of his *Miranda* rights [12] and that the State failed to disclose the exculpatory BVLS attempted robbery in violation of *Brady*. The court found that the police officers interrogating Wright failed to properly advise him of his *Miranda* rights. Thus, according to the Superior Court, his confession should not have been admitted because Wright did not knowingly and intelligently waive his rights.

The Superior Court denied the remainder of Wright's claims. The claims denied were that: (1) the jury was improperly instructed on the felony murder rule; (2) Wright was innocent under the "actually innocent" exception promulgated by the United States Supreme Court; (3) Wright's confession was involuntary; (4) all of Wright's prior postconviction counsel rendered ineffective assistance of counsel (the court found this claim to have been abandoned by Wright); (5) the jury should have been instructed that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt; and (6)

Wright's conviction must be vacated because of a *Brady* violation relating to prison informant Gerald Samuels.[13]

The State appealed the Superior Court's order vacating Wright's conviction and sentence. This Court reversed, finding that the *Miranda* claim that the confession was inadmissible was procedurally barred. And a majority of this Court found that the State's failure to disclose the BVLS evidence did not amount to a *Brady* violation in light of Wright's confession.[14] The case was remanded to the Superior Court.

On remand, Wright moved to clarify the status of his claims that the Superior Court rejected in its 2012 opinion. In his Motion to Address and Clarify Status of Unresolved Claims, Wright asked the Superior Court to: (1) clarify the status of the *Brady* claim regarding Gerald Samuels and (2) reconsider its prior ruling that Wright abandoned his claim for ineffective assistance of counsel at his second resentencing trial. The Superior Court denied the motion and reimposed Wright's conviction and death sentence. This appeal followed.

### III. Discussion

We review the Superior Court's decision on a motion for postconviction relief, including factual determinations, for abuse of discretion.[15] Questions of law and constitutional claims, such as claims that the State failed to disclose exculpatory evidence, are reviewed *de novo*.[16] The timeliness of an appeal is a jurisdictional ques-

---

11. *Wright,* 2012 WL 1400932, at *39.

12. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. Wright also raised a *Brady* claim related to Kevin Jamison, but the Superior Court only considered this evidence in relation to Wright's actual innocence claim.

14. *State v. Wright,* 67 A.3d 319, 325 (Del. 2013).

15. *Zebroski v. State,* 12 A.3d 1115, 1119 (Del. 2010); *Claudio v. State,* 958 A.2d 846, 850 (Del.2008); *Steckel v. State,* 795 A.2d 651, 652 (Del.2002).

16. *Zebroski,* 12 A.3d at 1119.

tion that this Court may consider at any time.[17]

## The Parties' Contentions

In this appeal, Wright contends that he is entitled to a new trial based on the cumulative error resulting from three different *Brady* violations. First, Wright claims that the State improperly failed to disclose evidence concerning Gerald Samuels, a cooperating witness. Second, Wright argues that the State failed to disclose evidence that could have been used to impeach the testimony of Kevin Jamison. And third, Wright proposes that these two pieces of evidence combined with the State's failure to disclose evidence related to the attempted robbery at the Brandywine Village Liquor Store are cumulatively *Brady* violations that require a new trial as a matter of due process.

Wright also argues that the trial court committed reversible error when it denied two claims of ineffective assistance of counsel related to: (1) trial counsel's investigation of mitigating evidence, and (2) the representation of postconviction counsel involving a lack of diligence and a conflict of interest. Finally, Wright contends that his death sentence is unconstitutional because 11 *Del. C.* § 4209(c)(3) did not require the jury and judge to find that the aggravating factors outweighed his mitigating factors beyond a reasonable doubt.

The State responds that all of Wright's claims currently on appeal are procedurally barred because he failed to cross-appeal these claims in the State's 2012 appeal to this Court. As a result, the State maintains that the Superior Court and this Court lack jurisdiction even to consider Wright's current claims. The State argues

that Wright's *Brady* claims are procedurally barred by Rule 61 of the Superior Court Rules of Criminal Procedure or, in the alternative, are without merit. The State also contends that Wright's ineffective assistance of counsel claims have either been abandoned or are without merit. Finally, the State denies that the Superior Court's weighing of Wright's aggravating and mitigating factors in deciding his death sentence violated the United States Constitution.

## Jurisdiction and Cross–Appeal Requirements

■ We first address whether this Court has jurisdiction to consider Wright's claims. The State argues that Wright's claims are waived because—when the State filed an appeal under 10 *Del. C.* § 9902(d) from the Superior Court's January 3, 2012 opinion and order vacating Wright's sentence and conviction—Wright failed to raise the claims in a cross-appeal. Section 9902(d) provides that:

> The State shall have an absolute right to appeal to an appellate court from any order entered in a lower court which grants an accused any of the following: a new trial or judgment of acquittal after a verdict; a modification of a verdict; an arrest of judgment; relief in any postconviction proceeding or in any action collateral attacking a criminal judgment; a new punishment hearing in a capital case after the court has imposed a sentence of death; or any order or judgment declaring any act of the General Assembly, or any portion of any such act, to be unconstitutional under either the Constitution of the United States or the State of Delaware, inoperative or unenforceable; except that no

---

**17.** *Koutoufaris v. Dick,* 604 A.2d 390, 401 (Del.1992).

appeal shall lie where otherwise prohibited by the double jeopardy clause of the Constitutions of the United States or of this State.[18]

Wright argues that, under the precedent of this Court, he was not authorized to file a cross-appeal under § 9902 and, thus, that his claims have not been waived.

■ As we explained in *State v. Cooley*, "the jurisdiction of this Court in criminal appeals is strictly defined by Article IV, Section 11(1)(b) of the Delaware Constitution. Any expansion of our jurisdiction should be clearly indicated by statute or constitutional amendment...."[19] This Court has held that, under Article IV, Section 11(1)(b) of the Delaware Constitution, this Court only has jurisdiction over final judgments in criminal cases.[20] But

Article IV, Section 11(1)(c) provides an exception to that general rule by granting this Court jurisdiction over appeals filed by the State in criminal cases where there is no final judgment in specific enumerated circumstances.[21] The General Assembly statutorily implemented the jurisdiction conferred by Article IV, Section 11(1)(c) through 10 *Del. C.* § 9902(d). Although the Delaware Constitution and § 9902(d) provide this Court with a clear grant of jurisdiction over appeals by the State from orders entered by the Superior Court granting a defendant relief in any postconviction proceeding, it is equally clear that nothing in those provisions expands the jurisdiction that this Court has to hear appeals from defendants. Thus, this Court has consistently held that it does not have jurisdiction to hear cross-appeals by

18. 10 *Del. C.* § 9902(d).

19. *State v. Cooley*, 457 A.2d 352, 356–57 (Del. 1983) (footnote omitted).

20. *See Kostyshyn v. State*, 856 A.2d 1066, 2004 WL 1874695, at *1 (Del.2004) ("Under the Delaware Constitution, this Court may review only a final judgment in a criminal case."); *Rash v. State*, 318 A.2d 603, 604 (Del.1974) ("Under settled Delaware constitutional law only a final judgment in a criminal case is reviewable in this Court."); *State v. Roberts*, 282 A.2d 603, 605 (Del.1971) ("This Court has repeatedly held that, under [Article IV, Section 11(1)(b) of the Delaware Constitution] the jurisdiction of this Court in criminal cases is limited of the review of final judgments...."); *Norman v. State*, 177 A.2d 347, 349 (Del.1962) ("Our general jurisdiction to review Superior Court proceedings in criminal cases is conferred by Article IV, Section 11, of the Constitution. This appellate jurisdiction is limited to cases in which a sentence of specified severity has been pronounced, i.e., to final judgments. Our Constitution was recently amended to confer upon this Court jurisdiction to entertain appeals from interlocutory judgments in the Superior Court in civil cases. Significantly, the section dealing with appeals in criminal causes was not so amended." (internal citation omitted)).

21. Article IV, Section 11(1)(c) of the Delaware Constitution provides that this Court shall have jurisdiction:

[T]o receive appeals from the Superior Court in criminal causes, upon application by the State in all causes in which the Superior Court, or any inferior court an appeal from which lies to the Superior Court, has granted an accused any of the following: a new trial or judgment of acquittal after a verdict, modification of a verdict, arrest of judgment, relief in any post-conviction proceeding or in any action collaterally attacking a criminal judgment, or a new punishment hearing in a capital case after the court has imposed a sentence of death, or any order or judgment declaring any act of the General Assembly, or any portion of any such act, to be unconstitutional under either the Constitution of the United States or the State of Delaware, inoperative or unenforceable, except that no appeal shall lie where otherwise prohibited by the double jeopardy clause of the Constitution of the United States or of this State. Notwithstanding anything in this Article to the contrary, the General Assembly may by statute implement the jurisdiction herein conferred.

defendants when the State files an appeal under § 9902(d).[22]

When the Superior Court entered its order vacating Wright's conviction and sentence on January 3, 2012, he was no longer under a final judgment. Thus, when the State appealed from that order, this Court would not have had jurisdiction over any cross-appeal from Wright claiming that the Superior Court should have based its order vacating his conviction and sentence not only on his two successful claims for postconviction relief, but also on his unsuccessful claims.[23] Wright's ability to challenge his remaining claims was not waived when he did not cross-appeal. Accordingly, now that Wright is under a final judgment, we have jurisdiction to consider this appeal.[24] To hold otherwise would leave Wright without a remedy to challenge the claims for postconviction relief that the Superior Court denied.

*Rule 61 Does Not Bar Wright's Brady Claim under the Miscarriage of Justice Exception*

The State next asserts that Wright's *Brady* claim related to Samuels is procedurally barred by Rule 61(i) of the Superior Court Criminal Rules of Procedure. This Court must consider Rule 61's procedural requirements "before addressing the merits of claims made in postconviction proceedings."[25] A postconviction motion is barred by Rule 61(i) where it is untimely, repetitive, or procedurally defaulted.[26] Such bars to relief do not apply where there is a "colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[27]

■ We consider the *Brady* claim under Rule 61(i)(5)'s narrow "miscarriage of justice" exception. Wright's claim was fully

**22.** *See, e.g., State v. Brower*, 971 A.2d 102, n. 42 (Del.2009) (finding that the Court lacked jurisdiction to hear the defendant's cross-appeal in an appeal filed by the state under § 9902(d)); *State v. Maxwell*, 620 A.2d 859, 1992 WL 401575, at *1 (Del.1992) (finding that the Court had no authority to hear a cross-appeal by a defendant in a case where the state appealed under § 9902); *State v. Marine*, 464 A.2d 872, 874 (Del.1983) (finding that cross-appeals were not permitted by § 9902); *Cooley*, 457 A.2d at 356 (explaining that Delaware law does not provide for cross-appeals under § 9902).

**23.** Such a result makes sense because Wright received everything that he was requesting from the Superior Court when his conviction and sentence were vacated, and he was granted a new trial. *See, e.g., Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1277 (Del.2000) ("Standing to cross-appeal, however, like standing to appeal, requires the party seeking relief to have been aggrieved by the judgment." (citing *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 334, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980))).

**24.** Although it might have been preferable, in the interest of judicial economy, for this Court to have heard Wright's claims in a cross-appeal when the State appealed in 2012, this Court's jurisdiction is circumscribed by Article IV, Section 11 of the Delaware Constitution. Because our jurisdiction is fixed by the Delaware Constitution, the policy question of whether the optimal balance in terms of judicial economy is struck by the current system—which does not permit a defendant who obtained all the relief she sought below to raise claims she did not prevail on through a cross-appeal—or a different system that would require a defendant who prevailed and had her conviction vacated to cross-appeal on any issue on which she did not prevail below in order to preserve that issue as an alternative basis for vacating her conviction is one that must be addressed by the General Assembly, not this Court.

**25.** *Wright*, 67 A.3d at 323 (citing *Younger v. State*, 580 A.2d 552, 554 (Del.1990)).

**26.** Super. Ct.Crim. R. 61(i)(1)-(4).

**27.** Super. Ct.Crim. R. 61(i)(5).

considered by the Superior Court. And it is well established that a colorable *Brady v. Maryland* violation falls within the miscarriage of justice exception.[28]

The State argues that we should instead evaluate Wright's motion under Rule 61(i)(4)'s "interest of justice" exception because this Court already considered and implicitly rejected the evidence related to Samuels. In relevant part, Rule 61(i)(4) provides that "[a]ny ground for relief that was formerly adjudicated ... in an appeal, [or] in a postconviction proceeding ... is thereafter barred."[29] Rule 61(i)(5)'s miscarriage of justice exception does not apply to the bar on formerly adjudicated claims under Rule 61(i)(4).[30] Claims barred by Rule 61(i)(4) may only be overcome in the interest of justice, a distinct standard.[31]

■ The State contends that this Court implicitly rejected on the merits Wright's *Brady* claim regarding Samuels during the State's 2012 appeal because Wright presented arguments on the claim in his answering brief. According to the State, this written discussion was sufficient to place the issue before this Court, thus constitut-

ing a previously adjudicated claim. We disagree.

Although Wright did discuss the Samuels evidence in his brief during the State's 2012 appeal, we did not reach the merits of that claim. On the State's 2012 appeal, the only issues before this Court were issues related to bail, Wright's confession, and the alleged *Brady* violation concerning the BVLS robbery.[32] Wright's cursory reference to Samuels' testimony in his answering brief does not show otherwise. The State did not brief the issue on appeal. Nor did this Court make any reference to Samuels' testimony in its decision. Rule 61(i)(4) does not bar Wright's *Brady* claim.

*The State's Cumulative Failure to Disclose Exculpatory Evidence Would Have Reasonably Altered the Result of Wright's Trial, Amounting to a* Brady *Violation*

Wright contends that the State violated his constitutional right to a fair trial by its cumulative failure to disclose exculpatory evidence. That evidence consists of undisclosed exculpatory and impeachment evi-

---

**28.** *Wright,* 67 A.3d at 324 (citing *Jackson v. State,* 770 A.2d 506, 515–16 (Del.2001)); *see also United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."); *Jackson,* 770 A.2d at 515–16 ("When the *Brady* rule is violated, postconviction relief can not be barred by Rule 61(i)(3) because a *Brady* violation undermines the fairness of the proceeding leading to the judgment of conviction. Because *Brady* violations strike at the core of a fair trial, the consequences of a failure to comply with *Brady* must be examined carefully.").

**29.** Super. Ct.Crim. R. 61(i)(4).

**30.** *See* Super. Ct.Crim. R. 61(i)(5) (providing that "[t]he bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to

... a colorable claim that there was a miscarriage of justice because of a constitutional violation").

**31.** *See* Super. Ct.Crim. R. 61(i)(4) (providing that formerly adjudicated claims may only be considered "in the interest of justice"). This Court has held that "the terms 'interest of justice' and 'miscarriage of justice' have different and distinct meanings under Rule 61." *Bailey v. State,* 588 A.2d 1121, 1127 n. 6 (Del.1991). The "interest of justice" exception requires the defendant show that " 'subsequent legal developments have revealed that the trial court lacked the authority to convict or punish' the accused." *Floyd v. State,* 670 A.2d 1337, 1995 WL 622408, at *2 (Del.1995) (quoting *Flamer v. State,* 585 A.2d 736, 746 (Del.1990)).

**32.** *Wright,* 67 A.3d at 322–25.

dence related to witnesses Gerald Samuels and Kevin Jamison, plus undisclosed evidence pertaining to the BVLS attempted robbery. Wright argues that these non-disclosures *cumulatively* amount to a *Brady* violation. We agree.

In the State's appeal in 2012, this Court only considered the suppression of the evidence related to the BVLS robbery. A majority of this Court held that although "[t]he BVLS 'evidence' was theoretically exculpatory," such evidence "had very little probative value" and did not otherwise create "a reasonable probability that the verdict would have been different." [33] The cumulative effect of the failure to disclose that and other exculpatory evidence is now before us for the first time.

■■■ According to United States Supreme Court, a *Brady* violation occurs where there is "suppression by the prosecution of evidence favorable to an accused . . . [that] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [34] The requirements of *Brady* are based on the premise that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." [35] Under *Brady*, "the prosecutor's success [is] measured not merely in terms of winning the competition, but winning fairly." [36] The requirement that prosecutors turn over all favorable evidence to the accused is illustrative of the prosecutor's obligation to "search for truth in criminal trials." [37] "The prosecutor plays a special role in the adversarial system that is not limited to representing the State but also includes the responsibility as a minister of justice." [38]

■■■ Implicit in this search for truth is the need to protect the innocent. "The justice system must not only strive to convict the guilty but also to acquit the innocent. If it mistakenly convicts the wrong person, it inflicts a grave injustice while leaving the guilty party free to commit more crimes." [39] Compared with Fourth Amendment or *Miranda* violations, a *Brady* violation is not a technicality in which the State oversteps its authority in its pursuit of a guilty perpetrator. [40] Rather, *Brady* seeks to ensure a fair trial.

■■■ Under *Brady* and its progeny, the State's failure to disclose exculpatory and impeachment evidence that is material to the case violates a defendant's due process rights. [41] The reviewing court may also consider any adverse effect from non-disclosure "on the preparation or presenta-

33. *Id.* at 325.

34. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

35. *Id.*

36. Bennett L. Gershman, *Reflections on* Brady v. Maryland, 47 S. Tex. L.Rev. 685, 708–09 (2006).

37. *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

38. *Kirkley v. State*, 41 A.3d 372, 376–77 (Del. 2012) (citing Del. Lawyers' Rules of Prof'l Conduct R. 3.8 cmt. 1).

39. Stephanos Bibas, *The Story of* Brady v. Maryland: *From Adversarial Gamesmanship Toward the Search for Innocence?, in* Criminal Procedure Stories 129, 138 (Carol Steiker ed. 2006).

40. *See id.* ("Innocence is not a technicality tangential to the criminal process. It is the main touchstone of the criminal process.").

41. *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375; *Brady*, 373 U.S. at 88, 83 S.Ct. 1194.

tion of the defendant's case."[42] "There are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant."[43] In order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense.[44] That entails a duty on the part of the individual prosecutor "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[45]

Whether a *"Brady* violation" has occurred often turns on the third component—materiality.[46] Materiality does not require the defendant to show that the disclosure of the suppressed evidence would have resulted in an acquittal.[47] Nor is a reviewing court required to order "a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.' "[48] Rather, the defendant must show that the State's evidence creates "a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[49] A reasonable probability of a different result occurs where the government's evidentiary suppression "undermines confidence in the outcome of the trial."[50] Materiality is not limited to the individual effect of each piece of exculpatory or impeachment evidence. Instead, materiality is determined "in the context of the entire record."[51] A reviewing court first evaluates the "tendency and force of the undisclosed evidence item by item."[52] The court then evaluates the "cumulative effect" of the suppressed evidence separately.[53] "Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, 'undermine[ ] confidence in the outcome of the trial.' "[54] The State's obligation under *Brady* to disclose evidence favorable to the defense "turns on the *cumulative effect* of all such evidence suppressed by the government."[55]

**42.** *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375.

**43.** *Starling v. State*, 882 A.2d 747, 756 (Del. 2005) (citing *Strickler*, 527 U.S. at 281–82, 119 S.Ct. 1936).

**44.** *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citing *Restatement (Second) of Agency* § 272 (1958)).

**45.** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

**46.** *Atkinson v. State*, 778 A.2d 1058, 1063 (Del.2001).

**47.** *Id.*

**48.** *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968)).

**49.** *Starling*, 882 A.2d at 756 (emphasis added) (quoting *Jackson*, 770 A.2d at 516).

**50.** *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375).

**51.** *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**52.** *Kyles*, 514 U.S. at 437 n. 10, 115 S.Ct. 1555.

**53.** *Id.*

**54.** *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir.2013) (alteration in original) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375), *cert. denied*, —— U.S. ——, 134 S.Ct. 61, 187 L.Ed.2d 253 (2013).

**55.** *Kyles*, 514 U.S. at 421, 115 S.Ct. 1555 (emphasis added).

■ The United States Supreme Court has explained that exculpatory evidence is any evidence that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [56] We have explained that impeachment evidence is evidence that "the defense can use to impeach a prosecution witness by showing bias or interest." [57] Such evidence falls within the *Brady* rule because it can be "favorable to an accused so that, if disclosed and used effectively, it might make the difference between conviction and acquittal." [58]

■ Under the first prong of the *Brady* analysis, Wright points to exculpatory or impeachment evidence that would have been favorable to his defense at trial concerning Gerald Samuels, Kevin Jamison, and the BVLS attempted robbery. First, Wright explains that the State failed to disclose before trial information about Samuels—a prison informant who testified against Wright as a surprise witness. The specific evidence is (among other things) that Samuels agreed to testify against a co-defendant in a drug case roughly six months before Wright's trial. [59]

At Wright's trial, the prosecutor introduced Samuels as a rebuttal witness to testify that Wright had admitted to killing Seifert. Rather than provide Wright's counsel with a copy of Samuels' criminal record, the prosecutor merely disclosed Samuels' four felony convictions following four guilty pleas. Wright's counsel never learned the facts of those convictions in time to adequately cross-examine Samuels at trial. One of these convictions was for trafficking in cocaine, possession of heroin, and conspiracy second degree. In connection with this conviction, Samuels entered into a plea agreement with the State to testify against his co-defendant in exchange for reduced charges and sentence only six months before Wright's trial. Samuels had been a cooperating witness to advance his self-interest, and at Wright's trial he was cooperating again.

Several state and federal courts have found the prosecution's failure to disclose a witness's prior cooperation with law enforcement alone amounts to a *Brady* violation. [60] Samuels' prior agreement to cooperate with the prosecution would have been useful impeachment evidence for

---

56. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

57. *Jackson*, 770 A.2d at 515 (quoting *Michael v. State*, 529 A.2d 752, 756 (Del.1987)).

58. *Id.* (internal quotation mark omitted) (quoting *Michael*, 529 A.2d at 756).

59. Wright also alleges that the State suppressed evidence of Samuels' subjective expectation of leniency in exchange for his testimony against Wright. Because the Superior Court found, as a factual matter, that there was no agreement, either express or implied, between Samuels and the State and any subjective expectation of leniency Samuels had was not evidence in possession of the State, we defer to that factual finding, which is supported by the record. *Wright*, 2012 WL 1400932, at *37; *see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557

U.S. 52, 68–70, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) (stressing that the government's *Brady* duties only apply to evidence suppressed during trial, not evidence the government acquires post-trial).

60. *See, e.g., Reasonover v. Washington*, 60 F.Supp.2d 937, 975 (E.D.Mo.1999) (finding a *Brady* violation where a witness "entered into a deal with prosecutors in exchange for favorable treatment"); *Williams v. State*, 152 Md. App. 200, 831 A.2d 501, 513–15 (Md.Ct. Spec.App.2003) (finding a *Brady* violation where the State suppressed the fact that a key witness at defendant's murder trial was a paid police informant), *aff'd*, 392 Md. 194, 896 A.2d 973 (2006); *Sarber v. State*, 2009 WL 2366097, at *5 (Minn.Ct.App. Aug. 4, 2009) (reversing a conviction where the State failed to disclose witness's cooperation discussions).

Wright at his trial.[61] Even though Samuels ultimately did not testify against his co-defendant in a different trial, his repeated willingness to testify in order to advance his own legal interests, given his criminal record, would have been helpful to the jury in weighing the credibility of Samuels' testimony.

■ The next item of *Brady* evidence raised by Wright relates to Kevin Jamison, a defense witness at Wright's trial. Wright sought to prove that Jamison and his cousin, Norman Curtis, were the actual perpetrators of Phillip Seifert's murder. When Wright's trial counsel asked Jamison about his relationship with Curtis, Jamison testified that he only saw Curtis "now and then" but "not often." [62] But the State had evidence showing that Jamison's testimony was false. One month before Wright's trial, Jamison and Curtis had been charged as co-defendants in a robbery. Jamison was arrested on August 19, 1992 for that robbery, two days after he testified at Wright's trial. Wright's trial was still underway.[63]

Both pieces of information about Jamison—the robbery charge with codefendant Curtis and the delay in making the arrest—would have provided exculpatory and impeaching evidence for Wright. The co-commission of a crime with Curtis would have undermined Jamison's testimony that he only associated with Curtis intermittently. This information tended to bolster Wright's claims that Jamison and Curtis were the joint perpetrators of Seifert's murder. Moreover, the fact that Jamison was not arrested until after he testified at Wright's trial would have been material to his credibility.

■ Wright's third item of exculpatory evidence relates to the BVLS attempted robbery. In our earlier decision, we assumed without deciding that the BVLS robbery was exculpatory and suppressed because this Court found that the failure to disclose this evidence, by itself, did not prejudice the verdict.[64] We now consider the cumulative effect of this and the other items of undisclosed evidence.[65]

The nearby BVLS attempted robbery occurred close in time to the Hi–Way Inn robbery. The two crimes occurred within forty minutes of each other and took place less than two miles apart. The descriptions of the suspects in the BVLS robbery were similar to the descriptions of the two men seen leaving the Hi–Way Inn.[66] Both

---

**61.** The agreement itself states that Samuels "agrees to testify truthfully against his co-def[endant] Larry Anderson concerning the events occurring on 10/23/91. [Samuels] agrees not to contest the State's recommendation." Wright's 2012 Answering Br. Appendix at B791. Samuels signed the plea agreement on February 13, 1992. *Id.* Although Samuels later disavowed his testimony in a sworn affidavit, Samuels' decades-later recantation is not part of this *Brady* analysis because such evidence could not have been available at trial or suppressed by the State.

**62.** Wright's 2012 Answering Br. Appendix at B1779.

**63.** Jamison and Curtis were indicted on July 17, 1992. Wright's trial began on August 11, 1992, and lasted until August 23, 1992.

**64.** *Wright,* 67 A.3d at 325.

**65.** *Cf. Kyles,* 514 U.S. at 440–41, 115 S.Ct. 1555 (reversing a conviction where it was unclear whether the Court of Appeals assessed cumulative materiality effect of the *Brady* evidence or made "a series of independent materiality evaluations").

**66.** George Hummell, a Hi–Way Inn customer, described the two men leaving the scene of the murder as one black male six feet tall, 170 pounds and a second black male approximately five-eight to five-ten, weighing 160 pounds. Deborah Milner, a Hi–Way Inn employee, described a man who came in the bar just before the shooting as a black male in his mid-twenties wearing a red plaid shirt. Based on the witness statements from Hum-

crimes involved the use of a firearm. The BVLS crime was an attempted robbery using a handgun, and the Hi–Way Inn murder involved the use of a .22 caliber weapon.

As the Superior Court noted, a plausible argument can be made that the unsuccessful perpetrators of the BVLS attempted robbery were the same individuals involved in the Hi–Way Inn robbery shortly thereafter. The court explained:

> It should be recalled that Debra Milner (the barmaid at the HiWay Inn) told police that prior to the crime a black man wearing a red plaid flannel shirt came into the tavern and apparently surveyed the scene. (After viewing photos Ms. Milner denied that either Wright or Dixon resembled that man.) No red shirt was ever found at Wright's or Dixon's home. But according to a report prepared by the Wilmington Police Department, Mr. Baxter described one of the Brandywine Village perpetrators as wearing a "red coat", suggesting

mell and Milner, police described the two men who robbed the Hi–Way Inn as (1) "a black, male, mid 20's, wearing possibly a red flannel shirt, black knit hat, black waist type jacket, dark loose fitting pants, dark shoes approximately 6′0″ and weighing 170 lbs." and (2) "a black, male, mid 20's, baseball type cap, dark clothing ... approximately 5′8″— 5′10″ and weighing 160 lbs." State's 2012 Opening Br. Appendix at A1. Comparatively, the police report of the BVLS robbery described the suspects based off of the clerk's description as:

> In this case Suspect # 1 is described as a black male, 5′11″, 160 lbs., slender build, 23 to 24 years old, was wearing all dark clothing except for a white baseball cap, he was clean shaven and a thin face and was armed with a long barrel blue steel handgun.
> Suspect # 2 is described as a black male, short, stocky built, wearing a tan jacket, white or light colored pants and white sneakers....

*Id.* at A5.

of course that it was one of the Brandywine Village perpetrators, not Wright or Dixon, who cased the HiWay Inn.[67]

Police ruled Wright and Dixon out as possible suspects based on Baxter's witness identification. Such evidence, if presented at trial, would have been exculpatory.[68]

■ Turning to the second prong of the *Brady* analysis, the record shows that the State suppressed exculpatory and impeachment evidence related to Samuels, Jamison, and the BVLS attempted robbery. When the State presented Samuels as a witness against Wright, the State disclosed that Samuels had a record of four prior felonies. The first two were the result of a guilty plea and the second two resulted from a plea agreement. Nothing in the record indicates that the State disclosed that the plea agreement for the latter charges that occurred just six months before Wright's trial included an agreement to cooperate and testify in exchange for a reduced sentence.[69] Al-

67. *Wright*, 2012 WL 1400932, at *38.

68. *Cf. United States v. Stevens*, 935 F.2d 1380, 1404 (3d Cir.1991) (concluding that a defendant may use other crimes evidence defensively "to negate his guilt of the crime charged against him" (quoting *State v. Williams*, 214 N.J.Super. 12, 518 A.2d 234, 238 (Ct.App.Div.1986))); *Watkins v. State*, 23 A.3d 151, 157 (Del.2011) (reversing a conviction where the trial judge excluded evidence of a similar robbery that could have been used by the defendant to support his misidentification defense).

69. The State argues that a reasonable investigation into Samuels' record would have informed Wright of the prior plea agreement. The facts of this case suggest otherwise. The prosecutor announced that Samuels would be a surprise rebuttal witness without prior notice to Wright. This was an insufficient amount of time for counsel to adequately prepare in time for trial. And in this time frame, it would have been unfair to require Wright to learn about the existence of all documentary

though Wright's counsel knew that Samuels had entered into a plea agreement, the State did not disclose the details and terms of his cooperation under that agreement—information that would have been useful impeachment evidence for Wright. Moreover, the limited disclosure of Samuels' record was insufficient because Wright's trial counsel could not adequately use the information or conduct any meaningful investigation given the State's timing of the addition of Samuels as a witness.[70]

■ The record also shows that the State failed to disclose evidence relating to Jamison. When Jamison testified that he saw his cousin Curtis only intermittently, the State was aware that Jamison and Curtis had been jointly indicted on robbery and conspiracy charges. Jamison and Curtis were indicted on July 17, 1992. Wright's trial began on August 11, 1992, and lasted until August 23, 1992. The State's failure to disclose the indictment against Curtis was a suppression of *Brady* evidence.[71] Even if the trial prosecutor was unaware of the charges against Jamison and Curtis, and there is nothing in the record to show that he was, the fact that others in the Attorney General's Office were aware of the indictment at the time of trial suffices to make the evidence *Brady* material.[72]

The State argues that the investigation of Jamison would have been readily ascertainable to Wright at the time of the trial, and the State had no motive to suppress it and no duty to disclose it to Wright. The State also contends that because Jamison was a defense witness, rather than a State's witness, it was not required to turn over impeachment evidence for Wright's own witness. In this instance, we disagree. Wright called Jamison to show that he and Curtis had killed Seifert at the Hi–Way Inn. He was likely a hostile, or at least an uncooperative, witness, and thus he was not a typical defense witness. Further, the State's suggestion that Jamison's indictment would have been available to Wright before or during trial is without support in the record. Even if that was true, the fact that the State chose not to arrest Jamison until after his testimony at Wright's trial would not have been a publicly available fact at the time. Thus, the State failed to disclose exculpatory and impeachment evidence relating to Jamison that would have been useful to Wright.

■ The record further supports the Superior Court's conclusion that the State did not comply with its *Brady* obligation for the BVLS evidence before and during

evidence related to Samuels. *See* Gershman, *supra*, at 696.

**70.** *Cf. Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir.2001) (finding a *Brady* violation where the government's disclosure prevented any "opportunity for a responsible lawyer to use the information with some degree of calculation and forethought").

**71.** *See Giglio*, 405 U.S. at 153–54, 92 S.Ct. 763 (holding that the prosecutor's nondisclosure of material evidence affecting a witness's credibility, which goes uncorrected, falls within the requirements of *Brady* ); *People v. Steadman*, 82 N.Y.2d 1, 603 N.Y.S.2d 382, 623 N.E.2d 509, 512 (1993) (holding that "the

prosecutor's duty extends to correcting mistakes or falsehoods by a witness whose testimony on the subject is inaccurate" under *Brady* ).

**72.** *See Kyles*, 514 U.S. at 438, 115 S.Ct. 1555 (explaining that the prosecutor has the burden "to insure communication of all relevant information on each case to every lawyer who deals with it" in order "to discharge the government's *Brady* responsibility" (quoting *Giglio*, 405 U.S. at 154, 92 S.Ct. 763)); *cf. United States v. Burnside*, 824 F.Supp. 1215, 1253–54 (N.D.Ill.1993) (explaining that a document received by the U.S. Attorney's Office "is imputed to the government for purposes of *Brady* ").

Wright's trial. The Superior Court found that the prosecutor was unaware of the BVLS investigation. But the police themselves raised the possibility that the suspects of the Hi–Way Inn crime could be the same suspects in the attempted robbery at the BVLS. On the same date, Monday, January 14, 1991, the Wilmington Police received a report of an attempted robbery involving two black males with a handgun about forty minutes before the Hi–Way Inn robbery/homicide. Although this information was reported in the newspaper shortly after the murder, there was no disclosure, publicly or by the police, that Wright had been ruled out as a suspect in the BVLS attempted robbery. Nor was Wright aware of the descriptions of the BVLS suspects or the existence of videotape and photographic evidence.

 The final consideration in the *Brady* analysis is the materiality prong of the cumulative evidence. As discussed above, to be material, evidence does not have to be so strong that, if admitted, it would have resulted in an acquittal. Instead, the defendant must show only a reasonable probability of a different result. "[T]he touchstone of due process analysis in cases [alleging a *Brady* violation] . . . is the fairness of the trial, not the culpability of the prosecutor."[73] Our analysis focuses on the fairness of Wright's trial.[74] Our inquiry under the materiality prong is whether the disclosure of the cumulative exculpatory and impeachment evidence withheld by the State creates a reasonable probability of a different outcome. We answer this inquiry in the affirmative.

In the State's 2012 appeal, a majority of this Court held that the BVLS evidence was exculpatory but "had very little probative value."[75] This decision was based on the circumstance that the BVLS evidence did not significantly bolster Wright's alibi defense or "create a reasonable probability that the verdict would have been different" in light of his confession.[76] Now, multiple *Brady* violations have been shown. The cumulative effect of these multiple *Brady* violations creates a reasonable probability that the verdict would have been different.

This cumulative *Brady* evidence alters the calculus on Wright's confession, his alibi defense, and the identity of the gunmen at the Hi–Way Inn. That evidence cuts across multiple, substantive bases supporting the jury's conviction and would have permitted Wright to attack the State's case from every angle.[77] Disclosure of Samuels' prior plea agreement could have been used to bolster Wright's claims that his confession was involuntary due to his drug intoxication and that he did

---

**73.** *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *see also United States v. Oruche*, 484 F.3d 590, 597 (D.C.Cir.2007) ("[O]ur focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." (quoting *United States v. Cuffie*, 80 F.3d 514, 517 (D.C.Cir. 1996))).

**74.** *See Jackson*, 770 A.2d at 515–16 (explaining that "a *Brady* violation undermines the fairness of the proceeding leading to the judgment of conviction . . . . strik[ing] at the core of a fair trial, the consequences of a failure to comply with *Brady* must be examined carefully"); *State v. Mullen*, 171 Wash.2d 881, 259 P.3d 158, 165–66 (2011) (en banc) ("The animating purpose of Brady is to preserve the fairness of criminal trials." (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir.2006))).

**75.** *Wright*, 67 A.3d at 325.

**76.** *Id.*

**77.** *Cf. United States v. Sipe*, 388 F.3d 471, 491–92 (5th Cir.2004) (explaining that the cumulative *Brady* evidence would have allowed the defendant to "attack the government's case from every angle").

not otherwise confess while in prison. Jamison's prior crimes could have been used to show that Jamison was lying on the stand. This evidence, together with the BVLS attempted robbery, could have been used to show that the State arrested the wrong suspect and that Jamison and Curtis were the perpetrators. Further, the revelation of the BVLS robbery could have raised doubts about the identity of the shooter and bolstered Wright's alibi defense. The potential cumulative impact of this evidence at the trial is material. The postconviction evidence led the Superior Court to conclude that it had no confidence in the outcome of the trial. Neither do we.

The State's suppression of this *Brady* evidence was also directly relevant to the penalty phase. Wright was limited in making a residual doubt allocution at the penalty phase. "Residual doubt" is described as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'"[78] This Court has held that a defendant who wishes to do so may discuss or argue in allocution facts supporting a residual doubt argument.[79] The evidence that was suppressed would have bolstered materially a plea by Wright for life imprisonment instead of the death penalty.

Because we find a reversible *Brady* violation based on the State's cumulative suppression of exculpatory and impeachment evidence, we do not reach Wright's other claims. Both the State and the defense are entitled to a fair trial in this case. We reverse the judgments of conviction and remand so that the Superior Court may conduct one.

### IV. Conclusion

The judgment of the Superior Court is **REVERSED** and this matter is **REMANDED** for a new trial.

---

**78.** *Zebroski v. State,* 822 A.2d 1038, 1049 (Del. 2003) (quoting *Franklin v. Lynaugh,* 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring)).

**79.** *Shelton v. State,* 744 A.2d 465, 496 (Del. 2000). The arguable facts include those from the guilt or penalty phase as well as new facts, subject to certain limitations, under Superior Court Criminal Rule 32(a)(1)(C) and 11 *Del. C.* § 4209(c)(2). *Id.*