IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RASHIE HARRIS, | § | |
| | § | No. 183, 2014 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: |
| | § | |
| v. | § | Superior Court of the |
| | § | State of Delaware, in and for |
| STATE OF DELAWARE, | § | New Castle County |
| | § | |
| Plaintiff Below, | § | Cr. I.D. No. 1102003278 |
| Appellee. | § | |

Submitted: March 4, 2015
Decided: April 8, 2015


Before **STRINE**, Chief Justice, **HOLLAND** and **VALIHURA**, Justices.


Upon appeal from the Superior Court. **AFFIRMED**.


Patrick J. Collins, Esquire, Collins & Roop, Wilmington, Delaware, for Appellant.


Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.


**VALIHURA**, Justice:

In this appeal, we are asked to consider the constitutionality of a show-up identification of a suspect brought back to the scene of the crime shortly after the commission of the crime. This case stems from crimes committed by defendant-below Rashie Harris ("Harris") at two barbershops -- Runn Way Unisex Barbershop ("Runn Way") in Southbridge, and Legends Barbershop ("Legends") on Clifford Brown Walk -- on different dates. The cases were consolidated. A grand jury returned a fifty-count indictment, including charges for Attempted Murder, Robbery, Burglary, Unlawful Sexual Contact, Kidnapping, Possession of a Firearm During the Commission of a Felony, Possession of a Deadly Weapon by a Person Prohibited, Carrying a Concealed Deadly Weapon, Endangering the Welfare of a Child, Possession of a Non-Narcotic Schedule I Controlled Substance, and Resisting Arrest. The first nine counts pertained to the Runn Way incident on January 30, 2011. The remaining counts pertained to the Legends incidents on February 5, 2011. The State entered a *nolle prosequis* prior to trial on all but one of the Kidnapping charges and their corresponding firearm charges.

After a jury trial, Harris was found guilty of the following offenses: Attempted Murder First Degree, eight counts of Robbery First Degree, two counts of Burglary Second Degree, Unlawful Sexual Contact First Degree, Kidnapping Second Degree, eleven counts of Possession of a Firearm During the Commission of a Felony, Carrying a Concealed Deadly Weapon, Endangering the Welfare of a

1

Child, Possession of a Non-Narcotic Schedule I Controlled Substance, and Resisting Arrest. The Superior Court also found Harris guilty of two counts of Possession of a Deadly Weapon by a Person Prohibited.[1] Harris was sentenced as a habitual offender pursuant to 11 *Del. C.* § 4214(a). Accordingly, Harris was sentenced to Level V incarceration for the balance of his natural life plus 524 years for his felony charges, and three years and five days for his misdemeanor charges.

Prior to trial, the defense filed a Motion to Sever Charges, a Motion to Suppress the Photo Lineup Identification, and a Motion to Suppress the Show-up Identification. After conducting a hearing and receiving post-hearing submissions, the trial court denied all three motions. After trial but before the verdict, the defense moved for reconsideration of and reargument on the denial of the Motion to Suppress the Show-up Identification. The Superior Court reserved judgment until after the verdict. Following a jury verdict of guilty on all counts, the pending Motion for Reargument was converted into a Motion for a New Trial. After hearing oral arguments, the Superior Court denied the motion.

On appeal, Harris argues that the Superior Court erred in denying his Motion for a New Trial. He contends that the admission into evidence of his show-up identification by witnesses to the incident in question violated his Due Process

---

[1] These charges had been severed and were heard in a simultaneous bench trial.

rights. We disagree, and for the reasons stated herein, we AFFIRM the judgment below.

## I.    FACTUAL AND PROCEDURAL HISTORY

On January 30, 2011, Harris walked into Runn Way. Harris asked Jonathan Wilson ("Wilson"),[2] who operated the barbershop, how much a haircut would cost. Before Wilson could respond, Harris pulled out a .38 revolver, and put his hand up to his mouth, indicating that everyone in the barbershop should remain quiet. Harris turned his attention to one of the patrons, and when he did, Wilson punched Harris in the face. Harris fired his revolver three times and hit Wilson in the chest. Harris went through Wilson's pockets and removed $50. He then left the barbershop.

On February 5, 2011, Ricky Cook ("Cook") was working at Legends. Deidrick Boyd ("Deidrick") and Darrel Boyd ("Darrel") were also working at Legends that day. Around noon, Harris entered the barbershop. Cook asked Harris if he wanted a haircut. Harris pointed to Darrel, indicating that he was waiting for Darrel to cut his hair. After about a half hour, Harris got up, covered his face, locked the door, and took out a .38 revolver. Harris told everyone to get down on the floor and keep his or her eyes down. Several customers were in the

_____

[2] Wilson changed his name from Jonathan Simmons to Jonathan Wilson in February 2011.

3

barbershop at this time, namely, David Lewis ("Lewis"), Heleema Bland ("Bland"), Shaun Powell ("Powell"), and Powell's thirteen-year-old stepson ("K. P."). Harris directed K. P. to close the blinds, take everyone's wallets, cash, keys, cell phones, and jewelry, and put them in Bland's purse. Harris warned K. P. that if he did not stay in school and get good grades that Harris was going to come back and shoot him. Harris then went around checking to see whether everyone had put his or her belongings into the purse. When Harris reached Bland, he turned her over and groped her breasts to see if she had any money hidden in her bra. Harris told K. P. to take off his clothes and go to the bathroom. Harris then started talking about a barbershop in Southbridge, claiming responsibility for the robbery.[3] Before leaving Legends, Harris said that he would shoot anyone who got up and looked out the window after he left.

Everyone at Legends had been lying on the ground, but a couple seconds after Harris left, everyone got up and looked out the window.[4] Deidrick saw Harris walk northbound on Clifford Brown Walk and turn onto Sherman Street. Diedrick followed Harris and watched him turn left on Lombard Street, and then turn onto

---

[3] App. to Appellant's Opening Br. at A471 (referencing the Southbridge robbery, Harris said "the dude . . . shouldn't have tried me.").

[4] App. to Appellant's Opening Br. at A472. Before Harris left, he opened and closed the door two times to see what everyone would do when he left. When he saw that Deidrick got up the first time he threatened to kill someone. *Id.*

4

11th Street, heading towards Pine Street. Diedrick hailed a motorist, Jimmie Gordon ("Gordon"), at 11th and Pine Streets. Gordon called 911 and helped Diedrick track Harris as the Wilmington Police Department responded to the call.

Officers Cain and Verna responded to the 911 call. When Harris saw the police officers, he dropped both of the bags he was carrying and began running. Officer Verna apprehended Harris while Officer Cain stayed with the two bags Harris had dropped. Officer Reiss arrived at the scene as Harris was being taken into custody. Officer Reiss searched Harris and found a plastic bag in Harris' front right pocket that contained five rounds of silver Winchester .38 special ammunition, and found ten clear blue plastic bags in Harris' rear left pocket that contained marijuana.

Officer Reiss took Harris to central booking. Sergeant Stevenson, the police officer in charge, then ordered Officer Reiss to bring Harris back to Legends for a show-up identification.[5] Officer Reiss brought Harris back to Clifford Brown Walk, arriving twenty or thirty minutes after the arrest. Officers Verna and Reiss each stood on either side of Harris as they brought him up to the window of the barbershop. The handcuffs on Harris were not removed. A majority of the

---

[5] Notably, Officer Reiss later testified that he was not involved in the show-up identification and had no recollection of it. He testified that he stood outside the car and let the other officers handle the show-up portion of the investigation.

witnesses were standing at the window.[6] They nodded their heads up and down, and pointed at Harris when he was brought up to the window of the barbershop.

That same day Harris made a custodial statement to the police. He explained that he committed the robbery at Legends because he owed money to a person named "Willie" who had threatened to kill his mother and sister if Harris did not pay his debt. Harris further explained that he made K. P. take off his clothes because he was trying to scare him so he would stay in school. Harris continued to explain that he felt Bland's breasts because "[a] lot of women keep money in they -- in they breast's area, in the bra." However, Harris denied being involved in the incident at Runn Way in Southbridge. He stated, "I didn't have nothing to do with no Southbridge shooting. This Barber Shop? Clifford Brown? Yes. But this Southbridge? That? No."

On February 10, 2011, police interviewed Wilson at the hospital regarding the incident at Runn Way. Wilson was shown two photographic lineups. He did not identify anyone from the first lineup, but identified Harris from the second lineup as the person who shot and robbed him at Runn Way.

---

[6] App. to Appellant's Opening Br. at A694. Powell and K. P. were not present for the show up identification. *Id.* at A501 ("Q. You left with [K. P.] shortly after this thing happened, right? A. Yes. Q. So you didn't stay behind for the police to arrive and things like that? A. No.").

On February 17, 2011, police arrested Harris on charges relating to the incident at Runn Way. The delay between the incident and arrest was due to Wilson being intubated and unable to speak to officers until February 10, 2011.[7]

At trial, Wilson unequivocally testified that Harris was the person who shot him. Specifically, Wilson testified that he was "a thousand percent sure" that Harris shot him. Harris also testified at his trial. He continued to deny any involvement in the Runn Way robbery and shooting. He explained that he encountered an individual who sold him marijuana and offered to sell him a handgun. Harris stated that he grabbed the gun, examined it, and walked into a nearby alleyway where he prepared to smoke marijuana. He was then apprehended by police. Harris explained that he knew a lot about the incident at Legends when he gave his custodial statement because he was "absorbing it like a sponge, absorbing everything that [the female officer is] telling me and, then, using it when I went to the room." Harris contended that if he admitted to the robbery, he believed he would "get unsecured bail or, later on down the road, get found not guilty." He further contended that "none of the officers gave [him] information about a Southbridge shooting." Otherwise, Harris argued that he would have falsely admitted to that incident as well.

---

[7] The bullet lodged in Wilson's spine and rendered him paralyzed in his legs.

In addition to the testimony from the witnesses to the incidents at Runn Way and Legends, the State presented testimony from expert witnesses. Carl Rone ("Rone"), the State police firearms examiner, testified that a bullet recovered from Runn Way was fired from the handgun found in the purple purse recovered after the incident at Legends. Paul Gilbert ("Gilbert"), a DNA analyst at the Office of the Chief Medical Examiner, testified that the gun recovered by police after the incident at Legends contained a mixed profile of Harris' and at least one other individual's DNA. Gilbert also testified that the DNA on the gun matched Harris to a "99.9999%" degree of certainty.

At the close of the evidence, the defense sought reargument of the denial of the Motion to Suppress the show-up identifications and subsequent in-court identifications. The basis for the application was the divergence in Sergeant Stevenson's testimony at the motion hearing versus at trial. The trial court reserved its decision until after the jury rendered its verdict. The defense's challenge to the show-up and in-court identifications then formed the sole basis for the Motion for a New Trial -- the denial of which is now the sole issue raised on appeal.

## II.  DISCUSSION

This Court reviews a trial court's denial of a Motion for a New Trial and denial of a Motion to Suppress for an abuse of discretion.[8]  However, where a Motion for a New Trial raises a constitutional violation, we review that issue *de novo*.[9]

Harris argues that the show-up identification violated the Due Process Clause of the United States Constitution and that the in-court identifications were tainted.  This Court has noted that show-up identifications "generally are inherently suspect and widely condemned."[10]  But we have also acknowledged that "an immediate on-the-scene confrontation between victim and suspect is essential both to law enforcement and to fairness toward innocent suspects alike."[11]

---

[8] *State v. Abel*, 2012 WL 6055799, at *2 (Del. Dec. 5, 2012) ("In general, we review the trial judge's grant of a motion to suppress for an abuse of discretion." (citing *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008))); *Barriocanal v. Gibbs*, 697 A.2d 1169, 1171 (Del. 1997) ("An appeal from a trial court's denial of a motion for new trial is governed by an abuse of discretion standard of review." (citing *Strauss v. Biggs*, 525 A.2d 992, 996-97 (Del. 1987))).

[9] *Swan v. State*, 28 A.3d 362, 382 (Del. 2011) (citing *Zebroski v. State*, 12 A.3d 1115, 1119 (Del. 2010)).

[10] *Clark v. State*, 344 A.2d 231, 237 (Del. 1975).

[11] *Harris v. State*, 350 A.2d 768, 771 (Del. 1975) (citing *Watson v. State*, 349 A.2d 738, 740 (Del. 1975)).  The *Harris* Court explained its concern "with any police-arranged simultaneous viewing of one suspect by more than one victim." *Id.* at 771, n.5.  The Court noted that it agreed with the statement by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Wilson*, namely:

> If it is feasible for each witness, victim or otherwise, to stand alone when asked to make the identification, aye nor nay, this is the course that should be followed. While the benefit of a prompt on-the-scene confrontation makes acceptable the

9

Specifically, a show-up identification serves the police, "who should not lose valuable time in looking for the offender if an apprehended suspect goes unidentified," and serves the innocent suspect, "who should not suffer undue custody awaiting police station identification."[12] Thus, we explained the test used for determining the admissibility of an out-of-court identification when it is challenged under the Due Process Clause as follows:

> An identification procedure will not pass constitutional muster where it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." That a confrontation is suggestive, without more, however, cannot amount to a due process violation; the unnecessarily suggestive identification procedure must also carry with it the increased danger of an irreparable misidentification. In other words, if the Court determines under the totality of the circumstances that a line-up is impermissibly suggestive, but nonetheless reliable, evidence of the confrontation will not be excluded at trial.[13]

Essentially, the test for determining whether there was a violation of the Due Process Clause has two prongs, namely, whether: "(1) the confrontation was

---

necessary suggestiveness of presentation of a single subject (a "show-up"), there is ordinarily no need for the additional element of suggestiveness of identification made at the same time by two or more witnesses in each other's company.

*Id.* (citing *United States v. Wilson*, 435 F.2d 403, 405 (D.C. Cir. 1970)).

[12] *Watson v. State*, 349 A.2d 738, 740 (Del. 1975).

[13] *Richardson v. State*, 673 A.2d 144, 147 (Del. 1996) (quoting *Younger v. State*, 496 A.2d 546, 550 (Del. 1985)).

unnecessarily suggestive, and (2) there existed a likelihood of [irreparable] misidentification."[14]

### A.  The Identification Was Not Unnecessarily Suggestive

The trial court held that the identification was not unnecessarily suggestive, and therefore, the court denied Harris' Motion for a New Trial.[15] We have noted that the issue of whether an identification of a suspect is unnecessarily suggestive "is invariably fact-driven."[16]

Harris argues that the show-up identification was overly suggestive because the show-up was not supervised by police officers, Harris was brought to the window at Legends in handcuffs by two uniformed police officers, the group of victims stood together, the victims were left to discuss the incident after it had occurred, and the process took less than ten seconds.[17]

---

[14] *Id.* (citing *Harris*, 350 A.2d at 770).

[15] Appellant's Opening Br. Ex. A. at 15-16 ("The case *sub judice* is similarly a permissible show-up. Within a half hour after the robbery, the Defendant, who was in police custody, was shown to a group of six victims, all of whom identified the Defendant as the robber. There was no indication of any hesitation or doubt by the victims when they made their identification. The officers did not in any way suggest to the victims that they had to make an identification. Additionally, the officers did not group the victims together purposefully. This case is similar to *Watson* in that the show-up could be considered a natural development and was not 'arranged' by the police.").

[16] *Swan*, 28 A.3d at 382 (citing *Zebroski*, 12 A.3d at 1119).

[17] Harris also urges us to consider the discrepancy of Sergeant Stevenson's testimony at the hearing concerning the Motion to Suppress the Show-up Identification and his testimony at trial. At the hearing, Sergeant Stevenson testified that he was inside Legends when Harris was brought up to the window for the witnesses to identify. He testified that each witness was "directed to go

In *Richardson v. State*, the victim was told prior to the identification that the police had the suspect in custody and they needed her to identify the suspect.[18] When she made the identification, the victim was surrounded by her relatives, and the suspect was handcuffed and standing next to a uniformed police officer.[19] We noted that since the show-up identification happened shortly after the offense, it weighed in favor of the identification not being unnecessarily suggestive.[20] Here, Harris was in handcuffs and standing next to uniformed police officers when the

---

up one at a time inside of the barber shop looking out of the large pane glass window." Sergeant Stevenson described that "when each victim made the identification, they were standing by themselves viewing the person in police custody by themselves with no one around them to basically influence them." Sergeant Stevenson indicated that the witnesses were never sequestered.

At trial, however, Sergeant Stevenson testified that he was both inside and outside of Legends when Harris was brought back for the show-up identification. He testified that while he was outside, he did not know what identification procedure was followed. Further, Sergeant Stevenson testified that he was outside while certain witnesses identified Harris, but walked in as others identified Harris. He received information from other officers that while he was outside a positive identification of Harris had been made. Sergeant Stevenson maintained that the witnesses were never sequestered. *See* App. to Appellant's Opening Br. at A808 ("Q: Did you make the judgment call that this was one of those cases that you couldn't sequester the witnesses? A: Yes. That was one of my observations once I got to the crime scene, that, apparently, the victims and witnesses had been talking prior to and they were not sequestered. The barber shop was one big room, so it was not like there was a room that was off that we could sequester the witnesses, since there were so many.").

Although we acknowledge that Sergeant Stevenson's testimony is not entirely consistent with his earlier testimony, even if we were to interpret the testimony in the light most favorable to Harris, it does not persuade us that the show-up identification procedure was unnecessarily suggestive as discussed further in this decision.

[18] *Richardson*, 673 A.2d at 147.

[19] *Id.*

[20] *Id.* at 148 ("She viewed him approximately one hour and fifteen minutes after the carjacking. The confrontation occurred shortly after the offense while Ludwig's memory was fresh and while Richardson was in the clothing that she stated he wore when he committed the offense.").

identification occurred.  Further, the identification occurred between twenty or thirty minutes after the incident, which is more quickly than the show-up identification that occurred in *Richardson*.

In *Watson v. State*, the defendant robbed a woman in her car while another woman was with the victim.[21]  The victim gave police a description of the defendant shortly after the incident.  Approximately thirty minutes after the robbery, the defendant was brought to the police car where both the victim and her friend were waiting.  The victim, after overhearing a police radio transmission that a man who fit the victim's description had been apprehended, unequivocally identified the defendant.  After the victim identified the defendant in front of her friend, her friend also made a positive identification by commenting on the defendant's distinctive shirt.  We held that "absent unnecessary and unfair police suggestion, prompt on-the-scene confrontations, *per se*, are not so unnecessarily suggestive as to constitute violations of due process rights."[22]  The simultaneous identification in *Watson* was not unnecessarily suggestive because it was "a natural development under all of the circumstance and was not 'arranged' by the police."[23]

---

[21] *Watson*, 349 A.2d at 739.

[22] *Id.* at 740.

[23] *Id.* at 741.

Rather, the confrontations were "prompt, practically on-the-scene, and of a 'res gestae' nature."[24]

Here, the victims knew that a suspect was being brought for them to identify. Harris was accompanied by two police officers during the identification. Although the witnesses here all saw and identified Harris simultaneously, there was no indication that this procedure was purposefully arranged by the police. Instead, it is likely the result of how quickly Harris was brought back for identification. Accordingly, the simultaneous identification of Harris followed by individual identifications was a natural development under all of the circumstances. The show-up identification procedure was not unnecessarily suggestive, and thus, the identification did not violate Harris' constitutional rights under the Due Process Clause.

### B.     There Was Not a Likelihood of Irreparable Misidentification

This Court has used the factors outlined by the United States Supreme Court in *Manson v. Brathwaite*[25] to determine the likelihood of irreparable misidentification.[26] In *Manson*, the Supreme Court set forth the following five factors to determine the reliability of the identification:  (1) the opportunity of the

---

[24] *Id.*

[25] 432 U.S. 98, 114 (1977).

[26] *See Richardson*, 673 A.2d at 148.

14

witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[27] We address each of these factors with respect to each witness who identified Harris at the show-up identification and in court -- namely, Darrell, Deidrick, and Cook. The other witnesses -- namely, Powell and his stepson K. P., Bland, Lewis, and Collins -- did not identify Harris. Powell and K. P. left before the police arrived, and therefore, were not present for the show-up identification and did not identify Harris at the trial.[28] Bland testified that she did not identify anyone in the show-up identification because she could only see the robber's mask and jacket.[29] Lewis testified that because he was on his stomach on the ground, he was unable to identify Harris.[30] Collins did not appear for trial so there was no specific testimony regarding any identification by him.

---

[27] *Manson*, 432 U.S. at 114; *see also Neil v. Biggers*, 409 U.S. 188 (1972).

[28] App. to Appellant's Opening Br. at A501 ("Q. You left with [K. P.] shortly after this thing happened, right? A. Yes. Q. So you didn't stay behind for the police to arrive and things like that? A. No.").

[29] App. to Appellant's Opening Br. at A491 ("Q. Once everyone as a group said yes or what have you -- well, let me ask you about what you said, did you identify -- A. No. Q. You didn't right? A. Because all I seen was his jacket and his mask.").

[30] App. to Appellant's Opening Br. at A508 ("Q. And when he's brought to the window, a suspect is brought to the window and you are saying that other people told you he changed his clothes from what he had on earlier? A. I said hoodie, jacket, whatever. People were saying it

15

*1. The Witnesses Had Ample Opportunity to View the Suspect*

The trial court noted that the witnesses had "clear opportunity to confront and observe the Defendant; the scene of the confrontation was well-lit and small in size."[31]  Our *de novo* review of the record supports a finding that the witnesses had ample opportunity to view Harris.  The evidence indicated that Harris entered Legends around noon. The barbershop was "very small" and was approximately 150 square feet in size.  When Harris entered the barbershop, Cook asked Harris if he wanted a haircut, and Harris pointed to Darrel indicating that he was waiting for Darrel to cut his hair.  Harris remained waiting for Darrel for about half an hour, without doing anything to hide his appearance.  Harris then stood up and covered his face for the first time.  During the time Harris was waiting, the witnesses had ample opportunity to observe Harris.

Darrell testified that he observed Harris for fifteen to twenty minutes before Harris put his mask on:  "Funny thing is, he put the mask on when he decided to do the robbery."  In making this comment, Darrell testified that he did in fact see

_____

was him.  I was saying I don't know, kind of look like his build, but I wasn't sure.  Q.  You didn't make an identification of an individual?  A.  Right.").

[31] Appellant's Opening Br. Ex. A. at 16.

Harris' face.[32]  Darrell also testified that he had ample opportunity to view Harris because Harris "sat down next to [him]."

Deidrick testified that Harris was about six to seven feet from him while Harris was waiting for a haircut.[33]  Deidrick also testified that he was able to see Harris' face.[34]  Further, Deidrick followed Harris out of the barbershop, eventually hailing a motorist, and calling the police.

Cook testified that he thought "it was funny because [Harris] was sitting there for a whole half an hour, [and he'd] seen [Harris'] face."  Cook also testified that he watches "out for whoever come[s] in [the shop], being[] as though [he's] the owner, so [he] feel[s] like everybody is [his] responsibility."  He testified further that he "notice[d] [Harris] come in and left back out for a couple seconds . . . [he] noticed him sitting there like he's waiting for a haircut."

Accordingly, each of the witnesses who identified Harris had ample opportunity to view the suspect based on the amount of time Harris was at

---

[32] App. to Appellant's Opening Br. at A535 ("Q.  And how much of the individual's face could you see at the time, before the black thing comes up?  A.  His face.").

[33] App. to Appellant's Opening Br. at A557 ("Probably about -- I would give him a good seven feet, six, seven feet, not that far away from me.").

[34] App. to Appellant's Opening Br. at A556 ("Q.  Okay.  So, prior to that, were you able to actually see his face?  A.  Yes. . . . Q.  And how long do you think you were able to clearly see his face before he put the hood up?  A.  Clearly see his face?  Q.  Yeah.  A.  A good five minutes.").

17

Legends, the close physical proximity of each witness to Harris, and the fact that Deidrick followed Harris until Harris' ultimate arrest.

## 2. *The Witnesses Paid a Sufficient Degree of Attention to Identify the Suspect*

The trial court noted that the witnesses' "attention was most likely high, as they were paying attention to the Defendant who had exposed a gun and threatened to use it."[35] Our *de novo* review of the record supports a finding that the witnesses had paid a sufficient degree of attention to identify Harris. Darrell testified that Harris was sitting right next to him for approximately twenty minutes while Harris was waiting for a haircut. Darrell also testified about what Harris was wearing, an indication that he paid attention to Harris while he was in the barbershop.[36] He further testified that he was paying close enough attention to Harris to get a good look at his face.

Deidrick testified that he was looking at Harris intermittently throughout the time that Harris was waiting to get a haircut, and that he "clearly" saw Harris' face for "[a] good five minutes." Deidrick also testified that he noticed Harris because

---

[35] Appellant's Opening Br. Ex. A. at 16.

[36] App. to Appellant's Opening Br. at A534 ("Q. Okay. And can you describe the hoodie that the individual was wearing? A. It was red, like black and white diamonds, like, blue diamond, like -- it just had a bunch of designs on it.").

Harris was in very close physical proximity to him.[37] He stated further that he was paying particularly close attention to Harris because "[he] just wasn't familiar with [Harris]." Further, Deidrick also described what Harris was wearing during the incident.[38]

As discussed above, Cook testified with respect to the attention he paid to his customers by stating that he watches "out for whoever come[s] in [the shop], being[] as though [he's] the owner, so [he] feel like everybody is [his] responsibility." He also testified that he "notice[d] [Harris] come in and left back out for a couple seconds . . . [he] noticed him sitting there like he's waiting for a haircut."

Accordingly, each of the witnesses paid a sufficient degree of attention to Harris to identify him as the person who committed the robbery.

---

[37] App. to Appellant's Opening Br. at A557 ("Q. So, he was close by, then? A. Very close, close enough to notice.").

[38] App. to Appellant's Opening Br. at A555-56 ("I remember he had on a black-hooded sweatshirt. It had diamond signs and money signs on it. It had a little bit of green in it, a little bit of red in it, but it was basically black with the, you know, accessories on it.").

### 3. The Accuracy of the Witnesses' Prior Description of the Suspect

The trial court property noted that "[p]olice confirmed that there was not a prior description of the suspect given before the show-up, so this factor does not affect the determination."[39]  Accordingly, this factor is not at issue on appeal.

### 4. The Witnesses Were Certain of Their Identification

Darrell, Deidrick, and Cook were all certain of their identifications.  Darrell testified that he was "1000%" certain that Harris was the person who robbed the barbershop.[40]  Additionally, Deidrick testified that he was "105%" certain of his in-court identification of Harris based upon Harris' nose, lips, and "everything about him.  [Deidrick] could never forget his face."[41]  Lastly, Cook testified that he was "[c]ertain, very certain" that the person who robbed the barbershop was Harris.  Accordingly, the certainty of the witnesses' identification suggests that there was little to no likelihood of misidentification.

---

[39] Appellant's Opening Br. Ex. A. at 16.

[40] App. to Appellant's Opening Br. at A524 ("Q.  Mr. Boyd, how certain are you that that's the person that came in the barber shop on February 5, 2011?  A.  I'm a thousand percent sure.").

[41] App. to Appellant's Opening Br. at A567-68 ("Q.  And the person you've identified in the courtroom today as the person who did all this, how sure are you that that's him?  A.  About 105 percent sure.  Q.  And what is that based upon?  A.  Based upon his eyes, based upon his nose -- his nose is distinctive.  I can remember his nose -- and the lips.  I remember everything about him.  I could never forget his face.").

*5. The Length of Time Between the Crime and Identification was Minimal*

The time between the crime and the identification also supports the conclusion that there was not a likelihood of irreparable misidentification. Officer Reiss took Harris back to Legends for the show-up identification twenty or thirty minutes after the arrest. Thus, the time between the crime and the identification was minimal.

Accordingly, the opportunity of the witnesses to view Harris at the time of the crime, their degree of attention, the level of certainty that they demonstrated with respect to their identification, and the length of time between the crime and the identification all support the conclusion that there was not a likelihood of irreparable misidentification.

## *C. Harmless Error*

Assuming, *arguendo*, that the show-up identification was unnecessarily suggestive and there existed a likelihood of irreparable misidentification, the decision to admit the identification into evidence at trial was harmless error. Under the harmless error standard, this Court looks to "whether the State has proved beyond a reasonable doubt that the error complained of did not contribute

to the verdict obtained."[42]  We explained the harmless error standard in more detail

by stating:

> [W]hen reviewing claims for harmless error, "[t]he reviewing court considers the probability that an error affected the jury's decision.  To do this, it must study the record to ascertain the probable impact of error in the context of the entire trial."  As a result, "'[a]ny harmless error analysis is a case-specific, fact-intensive enterprise.'"  "This approach indicates that the reviewing court must consider both the importance of the error and the strength of the other evidence presented at trial.  An error may be important if, for example, it concerned a witness giving significant testimony. . . ."  "Under a harmless error analysis, '[t]he defendant has the initial burden of demonstrating error,' and then the State has the burden to demonstrate that any error was harmless beyond a reasonable doubt."[43]

Here, the evidence in favor of convicting Harris was overwhelming -- even

without the identification evidence -- such that admitting the identifications into

evidence, if by error, was harmless beyond a reasonable doubt.

Harris gave a custodial statement on February 5, 2011.  During this

statement, Harris explained that he committed the robbery at Legends because he

owed money to a person named "Willie" who had threatened to kill his mother and

sister if he did not pay his debt.  Harris also explained that he had K. P. take off his

clothes because Harris was trying to scare K. P. so he would stay in school.  Harris

---

[42] *Purnell v. State*, 2014 WL 6999040, at *7 (Del. Sept. 24, 2014) (citing *Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988)).

[43] *Hansley v. State*, 104 A.3d 833, 837 (Del. 2014) (internal citations omitted).

continued to explain that he felt Bland's breasts because "[a] lot of women keep money in they -- in they breast's area, in the bra."

At trial, Deidrick testified that he followed Harris out of Legends and maintained nearly constant surveillance of Harris. Deidrick also testified that while Deidrick was following Harris, Deidrick saw Harris remove his hooded jacket and toss it on the ground. Deidrick further testified that Harris was "stuffing something in his -- in a book bag that he had, also. He also had the young lady's purse. I remember him stuffing things in her purse. So, I'm standing there, standing there, watching him."

Officer Cain testified that he saw Harris and said, "[c]ome here" and then Harris dropped both the bags he was carrying and began running. Officer Cain also testified about the bags Harris was carrying. Specifically, he stated "[t]he one bag was a purple-in-color purse. The second bag was, like -- it's a black puffy nylon material, black bag." Corporal Snyder testified that in the two bags was "haircutting equipment, pairs -- numerous pairs of electric clippers." Corporal Snyder further testified that "there was a handgun inside of the [purple] bag." Additionally, Officer Reiss testified that he searched Harris and found a plastic bag in Harris' front right pocket that contained five rounds of silver Winchester .38 special ammunition and ten clear blue plastic bags in Harris' rear left pocket that contained marijuana.

Rone, the State police firearms examiner, testified that a bullet recovered from Runn Way was fired from the handgun found in the purple purse recovered after the incident at Legends. Gilbert, a DNA analyst at the Office of the Chief Medical Examiner, testified that the DNA on the gun was a mixed profile of Harris and at least one other individual. Gilbert also testified that the DNA on the gun was Harris' to a "99.9999%" degree of certainty.

Further, the victim of the attempted murder, Wilson, made a firm in-court and out-of-court identification, and did not participate in any show-up identification of Harris. In addition, several of the victims of the Legends incident heard Harris discuss his participation in the Runn Way incident.

Accordingly, even if we were to conclude that the show-up identification was unnecessarily suggestive and there existed a likelihood of irreparable misidentification, the State has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

### III. CONCLUSION

Based upon the foregoing, the judgment of the Superior Court is hereby AFFIRMED.