IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELTON PUMPHREY, | § | No. 75, 2018 |
| | § | |
| Defendant Below-Appellant, | § | Court Below: |
| | § | |
| v. | § | Superior Court of the |
| | § | State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | Cr. I.D. No. 1611016239S |
| Plaintiff Below-Appellee. | § | |

Submitted: January 16, 2019
Decided: February 8, 2019

Before **VALIHURA**, **VAUGHN,** and **SEITZ**, Justices.

## O R D E R

This 8th day of February 2019, upon consideration of the briefs of the parties and the record below, it appears to the Court that:

(1)     Defendant Elton Pumphrey appeals his conviction of Carjacking in the First Degree, Robbery in the First Degree, and Offensive Touching. Those convictions result from an incident on November 21, 2016, when a sixty-four-year-old Jeffrey Lessig, Sr. agreed to give Pumphrey a ride home. As Lessig drove Pumphrey home, he slowly pulled into a cul-de-sac to ask Pumphrey for further directions. Pumphrey then pulled the keys out of the ignition, grabbed Lessig's face and threatened to rob him, and, when Lessig stated that he had no money, he took Lessig's car keys and cell phone and exited the vehicle. Lessig also left his vehicle and approached a bystander to ask for help. As Lessig sought help, Pumphrey re-entered the vehicle and drove away.

(2)     On appeal, Pumphrey challenges his convictions on the basis of Due Process and *Brady v. Maryland* violations.[1]  Additionally, he argues that no rational trier of fact could convict him of Offensive Touching.  The State denies Pumphrey's Due Process and *Brady* violation arguments, but it has admitted that the conviction of Offensive Touching was erroneous because it is a lesser-included offense of Robbery in the First Degree.

(3)     We conclude that the Superior Court did not err as to the robbery and carjacking convictions.  Because the State has admitted error concerning the Offensive Touching conviction, we need not reach the merits of Pumphrey's argument on that issue.

(4)     Therefore, we AFFIRM Pumphrey's convictions of Carjacking in the First Degree and Robbery in the First Degree, and VACATE Pumphrey's conviction of Offensive Touching.

* * *

(5)     On November 21, 2016, Lessig received a call from his granddaughter notifying him that the water heater in her manufactured trailer home, which she rented from Lessig, had malfunctioned.  She also stated that there was a man looking at the water heater who wanted to speak with Lessig.  When Lessig arrived at the home in the Cool Springs Farms development, he saw his grandson standing outside the home along with three other men.  Inside the home, one of the men—later identified as Pumphrey—offered to repair the water heater for $40.  Lessig declined the offer and walked outside toward his two-seat Mazda Miata.  At this point, the parties' stories diverge.

---

[1] 373 U.S. 83 (1964).

2

(6)     The State alleges that Pumphrey asked Lessig for a ride, and, with Lessig's permission, he entered the car and gave directions as Lessig drove.  After Lessig turned onto a cul-de-sac and asked Pumphrey where he lived, Pumphrey pulled the keys out of the ignition and twice threatened to rob Lessig—once grabbing him by the face.  Lessig gave Pumphrey his empty wallet and told him that he had no money.  Pumphrey then took Lessig's keys and mobile phone as he exited the car.  Lessig also left the car and approached a man nearby who let him use his cell phone to call the police.  During that time, Pumphrey got back into Lessig's car and drove away.  The bystander stayed with Lessig until Trooper Murray, the responding police officer, arrived.

(7)     Murray canvassed the neighborhood and asked a local resident if he had heard who committed the crime.  The resident began pronouncing a word starting with "B," but was unable to think of the full name.  Murray then suggested that it might be "Boyer," a name affiliated with crime in the Cool Springs Farms area, which the resident confirmed. Murray included the possible "Boyer" suspect in his contemporaneous notes.  The next day, Detective Doughty took over the investigation and reviewed Murray's police report. Doughty thought that the section of the report concerning Boyer was vague, so he emailed Murray instructing him to "clean it up."[2]

(8)     Police also interviewed Lessig's grandson, who said that "Bowl" was the man inside the trailer home looking at the hot water heater.  Another individual in the Cool

---

[2] App. to Opening Br. at A108–09.  By the time of trial, Murray had disposed of his investigation notes as he was spring cleaning. *Id.* at A92.  He testified at trial, however, that his police report— which was available to Pumphrey in the State's first discovery response over two months before trial—included everything in his notes.

Springs Farms development told Doughty that "Bowl" was Pumphrey's nickname. Lessig described the perpetrator as a black male between 6'2" to 6'4" and 200 to 210 pounds. Lessig's grandson provided a similar description of the man looking at the water heater, describing him as a black male who was 6'4" to 6'5", 220 to 230 pounds, and appeared to be in his forties.

(9) After obtaining Pumphrey's name, Doughty created a six-photo lineup using Pumphrey's mugshot and pictures of men of similar appearance. Doughty did not pursue an investigation of "Boyer" because he did not fit the general description of the suspect.[3] Further, the trial court found that there was no evidence that Boyer was in the area at the time of the offense.[4]

(10) Doughty conducted the photo identification at Lessig's trailer home two days after the incident occurred, which he audiotaped in its entirety. First, Doughty presented the photo lineup to Lessig's grandson, who identified Pumphrey "with not a doubt in [his] mind," "110%" as "the person who jacked my pop."[5] Doughty then presented the photo lineup to Lessig in the kitchen, while his grandson remained in the living room. Lessig told Doughty that he was not certain he could identify the perpetrator. Lessig's grandson can be heard on the audiotape encouraging him to look at the photo lineup. Doughty explained that the perpetrator was not necessarily in the lineup and that, if Lessig did not

---

[3] *Id.* at A109–10 (showing that Boyer was about 5'7", which did not match the description of the perpetrator, who Lessig and his grandson described as being 6'2" or taller).

[4] Ex. C to Opening Br. at 1 n.1 (Order Denying Mot. for Judgment of Acquittal).

[5] State's Trial Ex. 1, 2; *see also* Ex. A to Opening Br. at 98.

see him, he should not feel compelled to make an identification. Doughty then showed Lessig the photo lineup and Lessig identified Pumphrey as the perpetrator, although he told Doughty that he did not think Pumphrey wore glasses during the incident, as Pumphrey did in his mugshot.

(11) Doughty obtained an arrest warrant for Pumphrey, who turned himself in the same day. In his interview with Doughty, Pumphrey offered a different account of the events. He admitted that he was in the trailer home with Lessig and Lessig's grandson to examine the water heater, that he drove the car after borrowing it from Lessig, purchased liquor while driving the car, and later abandoned the car on the side of the road after it broke down without notifying Lessig. He further asserted that those events took place the day after Lessig was carjacked by a different person.

(12) Leading up to trial in May 2017, Pumphrey filed a Motion to Exclude Identification Evidence, which the trial court denied in June 2017. After trial, the jury found Pumphrey guilty on all counts. Pumphrey then filed a motion for judgment of acquittal based on alleged improper identification, and a motion for a new trial based on the alleged *Brady* violation. The Superior Court denied both motions.

(13) On February 13, 2018, Pumphrey filed a Notice of Appeal with this Court. The State filed a Notice of Cross-Appeal on March 9, 2018, but ultimately stipulated to dismissal of its cross-appeal on October 3, 2018.

\* \* \*

(14) Pumphrey challenges his robbery and carjacking convictions on three grounds. He claims that: (1) the denial of his motion to exclude a pre-trial identification constituted a violation of his Due Process Rights; (2) the State committed a *Brady* violation concerning evidence of a second suspect; and (3) introduction of Detective Doughty's comments during Pumphrey's police interrogation constituted improper vouching of the State's position.

(15) We review Pumphrey's claims of Due Process and *Brady* violations *de novo*.[6] As to Pumphrey's vouching claim, where an objection is raised at trial, this Court applies an abuse of discretion standard to "a trial court's ruling admitting or excluding evidence."[7] But "[a]bsent an objection at trial, this Court reviews an evidentiary issue only if the ruling constitutes plain error affecting substantial rights."[8] Affirmatively waived evidentiary issues "are not reviewable on appeal."[9]

(16) *First*, Pumphrey argues on appeal that the Superior Court violated his due process rights when it admitted the pre-trial identification. Specifically, he argues that

---

[6] *See Harris v. State*, 113 A.3d 1067, 1072 (Del. 2015) ("This Court reviews a trial court's denial of a Motion for a New Trial and denial of a Motion to Suppress for an abuse of discretion. However, where a Motion for a New Trial raises a constitutional violation, we review that issue *de novo*." (citations omitted)); *Wright v. State*, 91 A.3d 972, 982 (Del. 2014) ("Questions of law and constitutional claims, such as claims that the State failed to disclose exculpatory evidence, are reviewed *de novo*." (citations omitted)).

[7] *Stevenson v. State*, 149 A.3d 505, 509 (Del. 2016) (citations omitted).

[8] *Id.* (citations omitted).

[9] *Id.* (citing *King v. State*, 239 A.2d 707, 708 (Del. 1968)).

Lessig's pre-trial identification was impermissibly suggestive and created a substantial likelihood of irreparable misidentification. As a result of the improper pre-trial identification, he also argues that Lessig's in-court identification was tainted. The Superior Court found that "[b]ased on all of the circumstances and considering the facts, as presented; listening to the audiotape, I'm satisfied that there is no unnecessarily suggestive conduct on the part of the police or any circumstances that would create a question of reliability . . . ."[10] Further, the court found that there was "nothing in the manner in which the grandfather exercised his determination of whether the perpetrator was in that lineup that was unnecessarily suggestive or created a risk of misidentification."[11]

(17) An identification procedure "will not pass constitutional muster where it is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"[12]

(18) As the trial court recognized, the identification process was not pristine.[13] Lessig's grandson was in the home when Lessig identified Pumphrey, and the grandson even suggested to Lessig that he should identify the perpetrator if he sees him. The complete recording of the identification process, however, reveals that the grandson did

---

[10] Ex. A to Opening Br. at 97 (June 8, 2017 Order Denying Mot. to Exclude Identification).

[11] *Id.* at 98.

[12] *Younger v. State*, 496 A.2d 546, 550 (Del. 1985) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Harris*, 113 A.3d at 1073 ("Essentially, the test for determining whether there was a violation of the Due Process Clause has two prongs, namely, whether: (1) the confrontation was unnecessarily suggestive, and (2) there existed a likelihood of [irreparable] misidentification." (internal quotation omitted)).

[13] Ex. A to Opening Br. at 98 (June 8, 2017 Order Denying Mot. to Exclude Identification) ("The circumstances were not pristine. . . . [B]ut the Court doesn't require pristine circumstances.").

7

not suggest a specific person out of the lineup or give any known hints. Further, Doughty explained to Lessig that the perpetrator was not necessarily in the photographic lineup and that he should not feel compelled to identify anyone if he did not recognize the perpetrator. Thus, although it was imperfect, the identification process was not impermissibly suggestive.

(19) Even assuming, *arguendo*, that the identification process was impermissibly suggestive, it did not give rise to a substantial likelihood of irreparable misidentification. We look to the five factors in *Manson v. Brathwaite*[14] to determine the likelihood of irreparable misidentification: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation."[15] Here, the *Manson* factors support the trial court's admission of the pre-trial identification. Both Lessig and his grandson interacted with Pumphrey in close quarters and accurately described Pumphrey's physical characteristics. Further, Lessig's grandson identified with "110%" certainty that Pumphrey was the perpetrator, while Lessig himself identified Pumphrey out of the same photographic array. Finally, only two days elapsed between the incident and the identification of Pumphrey in the photographic lineup.[16] Thus, we agree

---

[14] 432 U.S. 98 (1977).

[15] *Harris*, 113 A.3d at 1075 (citing *Manson*, 432 U.S. at 114).

[16] *Manson*, 432 U.S. at 108 (noting that "[o]nly two days elapsed between the crime and the photographic identification.").

with the trial court that "nothing in the manner in which the grandfather exercised his determination of whether the perpetrator was in that lineup that was unnecessarily suggestive or created a risk of misidentification."[17] Accordingly, the Supreme Court did not abuse its discretion in denying Pumphrey's motion to suppress the identification. But even if it had, given the overwhelming evidence, any error in the identification procedure was harmless.

(20) *Second*, Pumphrey argues on appeal that the trial results would have been different but for two *Brady* violations concerning the identification of another possible suspect. The Superior Court denied the motion for a new trial as untimely and without merit, and found that the evidence against him was "significantly overwhelming."[18] Additionally, the Superior Court denied the motion for judgment of acquittal, stating that the evidence was overwhelming and "clearly sufficient to support the jury's verdict on each of the charges."[19]

(21) In *Starling v. State*,[20] we reiterated the proper analysis for evaluating a *Brady* claim:

> There are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant. In order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense. That

---

[17] Ex. A to Opening Br. at 98 (June 8, 2017 Order Denying Mot. to Exclude Identification).

[18] Ex. B to Opening Br. at 5 (Sept. 12, 2017 Order Denying Motion for a New Trial).

[19] Ex. C to Opening Br. at 2 (Dec. 21, 2017 Order Denying Mot. for Judgment of Acquittal).

[20] 130 A.3d 316 (Del. 2015).

9

entails a duty on the part of the individual prosecutor to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.[21]

The existence of a *Brady* violation often hinges "on the third component—materiality."[22] To find materiality, "the defendant must show . . . that the suppressed evidence 'creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[23] "In other words, the suppression of evidence must 'undermine[] confidence in the outcome of the trial.'"[24]

(22)   Pumphrey argues that the State committed two *Brady* violations by failing to disclose: (1) Murray's contemporaneous notes of his interview with a local resident, during which Murray suggested the name "Boyer" as a possible suspect in the carjacking; and (2) an email from Doughty to Murray instructing him to clean up the section of his police report concerning Boyer, which Pumphrey claims the State concealed until Doughty's testimony at trial.[25]

(23)   The State counters that the contents of the email were presented to the jury through Doughty and Murray's testimony, and that Murray testified that the police report, which the State produced over two months before trial, contained everything in his notes—

---

[21] *Id.* at 332–33 (quoting *Wright*, 91 A.3d at 987–88).

[22] *Wright*, 91 A.3d at 988 (citing *Atkinson v. State*, 778 A.2d 1058, 1063 (Del. 2001)).

[23] *Starling*, 130 A.3d at 333 (quoting *Wright*, 91 A.3d at 988).

[24] *Id.*  Further, the materiality of omitted evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).

[25] The State later produced the email *in camera* to the trial judge in connection with Pumphrey's post-trial motions.

10

including the possible "Boyer" suspect. Moreover, the State points to Superior Court Rule of Criminal Procedure 16(a)(2), which provides that with certain exceptions (not relevant here), the rule "does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the attorney general or other state agents in connection with the investigation or prosecution of the case, or of statements by state witnesses or prospective state witnesses."[26] Thus, the State argues that neither the email exchange nor Murray's contemporaneous notes qualify as exculpatory or material evidence under *Brady*.

(24) The Superior Court found that defense counsel "fully explored" the email contents during the officers' testimony and "effectively argued to the jury that there was another suspect" that the police decided not to pursue.[27] Murray also testified at trial that he included in his report all of the information from his notes, and neither party could show evidence to the contrary. Moreover, the trial court found that the evidence against Pumphrey "was *significantly overwhelming*."[28] Pumphrey himself admitted in his interview with Doughty, which was introduced at trial, that he was at the trailer home, looked at the hot water heater with Lessig, drove Lessig's vehicle—although he claims it was with permission—and then abandoned the vehicle after purchasing a bottle of liquor found in the abandoned car. Additionally, Lessig and his grandson described Pumphrey

---

[26] Super. Ct. Crim. Rule 16(a)(2) (2019).

[27] App. to Opening Br. at A118 (Office Conference Transcript).

[28] *Id.* at A119 (emphasis added).

11

similarly and identified Pumphrey out of a six-photo lineup. Thus, we agree with the Superior Court's findings and conclude that Pumphrey's *Brady* violations are meritless.

(25) *Third*, Pumphrey argues on appeal that the introduction into evidence of Doughty's comments on the video recording of Pumphrey's police interrogation—in which Doughty told Pumphrey that he was an advocate for Lessig and that he believed Lessig—amounted to impermissible vouching.[29] Additionally, Pumphrey asserts that counsel's failure to seek redaction of Doughty's comments was not a strategic decision, but rather, was mere oversight. In support of that argument, Pumphrey notes that his counsel objected to the State's questioning of Doughty during trial as to Doughty's opinions on the witnesses' various accounts of what transpired.

(26) The State argues that Pumphrey affirmatively waived any objection to the admission of Pumphrey's police interview when trial counsel expressly stated he had no objection to admission of the unredacted video recording. Even if it were error, the State argues that it was harmless due to the overwhelming evidence against Pumphrey. Further, the State contends that defense counsel's objection to Doughty's trial testimony proves the

---

[29] *See Luttrell v. State*, 97 A.3d 70, 78 (Del. 2014) ("Under Delaware law, a 'witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth.' Impermissible vouching 'includes testimony that *directly or indirectly* provides an opinion on the veracity of a particular witness.'" (quoting *Richardson v. State*, 43 A.3d 906, 910 (Del. 2012)).

opposite of what Pumphrey argues—that counsel's earlier failure to object to the unredacted video recording was a strategic decision, not an oversight.[30]

(27)  In *Stevenson v. State*,[31] we held that "there is an express and effective waiver as to any appellate presentation on an issue where defense counsel responds to queries by a trial judge, by stating that there are no objections to the admission of evidence."[32] "Indeed, such affirmative statements are a stronger demonstration of a waiver 'than the mere absence of an objection.'"[33]

(28)  Here, like the *Stevenson* defendant, Pumphrey offered no objection to admitting the interrogation video into evidence.  Instead, his counsel informed the court, "[t]hat is without objection, Your Honor."[34]  Yet, immediately afterwards, when the State asked the detective to "explain the consistencies and inconsistencies" between the differing versions of the witnesses' accounts, Pumphrey's counsel objected.[35]  The trial court sustained Pumphrey's objection, and instructed the jury that it is their "duty and responsibility to determine the facts" and resolve contradictions in testimony.[36]  Based upon the record before us, we conclude that Pumphrey's argument has been waived.

---

[30] Likewise, the State notes that "trial counsel proposed redactions for other interviews, but not Pumphrey's," suggesting that Pumphrey strategically chose not to redact the vouching.  *See* Answering Br. at 27.

[31] 149 A.3d 505 (Del. 2016).

[32] *Id.* at 516 (citing *King*, 239 A.2d at 709).

[33] *Id.* (quoting *King*, 239 A.2d at 708).

[34] App. to Opening Br. at A105 (Direct Examination of Doughty).

[35] *Id.* at A106.

[36] *Id.* at A107.

13

\* \* \*

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Superior Court be, and the same hereby is, AFFIRMED in part concerning Pumphrey's conviction of Carjacking in the First Degree and Robbery in the First Degree, and VACATED in part concerning Pumphrey's conviction of Offensive Touching.

BY THE COURT:

/s/ *Karen L. Valihura*
Justice

14